UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

ROCHELLE COLEMAN,

                                    Plaintiff,
                                                              5:16-CV-00836
v.                                                            (LEK/TWD)

SYRACUSE POLICE DEPARTMENT, et al.,

                                    Defendant.
_____

APPEARANCES:

ROCHELLE COLEMAN
Plaintiff pro se
231 Lilac Street
Syracuse, New York 13208


**THÉRÈSE WILEY DANCKS**, United States Magistrate Judge

<u>**ORDER AND REPORT-RECOMMENDATION**</u>

    The Clerk has sent to the Court three complaints filed in one action at the request of pro

se Plaintiff Rochelle Coleman.[1]  (Dkt. Nos. 1, 1-1, and 1-2.)  Each of the separate complaints has

---

    [1]  Records from the Clerk's Office show that this lawsuit is one of five presented to the
Clerk's Office for filing on July 8, 2016.  Each appears to contain multiple complaints.  *See
Coleman v. Engle*, No. 5:16-cv-833 (MAD/DEP) (challenging the handling of her family's public
assistance benefits, including charges of errors, fraud, and theft of benefits by Onondaga County
Social Services workers ); *Coleman v. Detter*, No. 5:16-cv-834 (MAD/DEP) (suing attorneys
involved in a Family Court child protective proceeding involving Plaintiff and her children);
*Coleman v. Sutkowsky*, No. 5:16-cv- 837 (MAD/DEP) (claim that defendants have ignored her
welfare fraud complaints against Onondaga County Social Services workers); and *Coleman v.
Olinsky*, No. 5:16-cv-838 (MAD/DEP) (lawsuit against Plaintiff's attorneys claiming that
benefits were unlawfully taken, overcharging on fees, and benefits wrongfully unreported).
Plaintiff earlier presented two lawsuits containing multiple complaints for filing on June 22,
2016.  *See Coleman v. Levandowski*, No. 5:16-cv-734 (NAM/ATB) (claims against social
workers involved in child protective proceeding involving Plaintiff and her children); and
*Coleman v. Hanuszczak*, No. 5:16-cv-735 (NAM/ATB) (suit against Family Court Judge in child

purportedly been brought pursuant to a different civil rights statute: 42 U.S.C.§ 1983 (Dkt. No. 1); Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e-5 (Dkt. No. 1-1); and the Americans with Disabilities Act ("ADA"), 42 U.S.C. §12101, *et seq*. (Dkt. No. 1-2.) Plaintiff has sued the Syracuse Police Department and the 911 Administration Center.[2] *Id*. Plaintiff has also filed two motions to proceed *in forma pauperis* ("IFP application") and a motion for the appointment of counsel. (Dkt. Nos. 2, 2-1 and 4.) For the following reasons, the Court will grant Plaintiff's first IFP application (Dkt. No. 2); deny her second IFP application (Dkt. No. 2-1) as moot; recommend dismissal of her three complaints (Dkt. Nos. 1, 1-1, and 1-2) with prejudice for failure to state a claim; and deny her motion for the appointment of counsel (Dkt. No. 4) without prejudice.

## I.    IFP APPLICATION

A court may grant *in forma pauperis* status if a party "is unable to pay" the standard fee for commencing an action. 28 U.S.C. § 1915(a)(1). After reviewing Plaintiff's first IFP Application, the Court finds that Plaintiff meets this standard. Therefore, Plaintiff's IFP application (Dkt. No. 2) is granted and her second application (Dkt. No. 2-1) is denied as moot.

---

protective proceeding).

[2] Although the Syracuse Police Department is the named Defendant, Plaintiff has listed "Chief of Police" as the official position of Defendant. (Dkt. No. 1 at ¶ 3.) In light of Plaintiff's pro se status, the Court will review the complaint as though both the Syracuse Police Department and the Chief of Police had been named as Defendants. Plaintiff has also named the 911 Administration Center as a Defendant. *Id*. Plaintiff has listed the "Call Operators" as the official position of the 911 Administration Center. *Id*. Inasmuch as Plaintiff has not identified any specific call operators, the Court will treat the 911 Administration Center as the sole Defendant in its analysis. *Id.*

## II.    LEGAL STANDARDS FOR INITIAL REVIEW

Even when a plaintiff meets the financial criteria for *in forma pauperis*, 28 U.S.C.

§ 1915(e) directs that when a plaintiff proceeds *in forma pauperis*, "the court shall dismiss the

case at any time if the court determines that . . . the action . . . (i) is frivolous or malicious; (ii)

fails to state a claim on which relief may be granted; or (iii) seeks monetary relief against a

defendant who is immune from such relief."  28 U.S.C. § 1915(e)(2)(B)(i)-(iii).

In determining whether an action is frivolous, the court must look to see whether the

complaint lacks an arguable basis either in law or in fact.  *Neitzke v. Williams*, 490 U.S. 319, 325

(1989).  "An action is frivolous when either: (1) the factual contentions are clearly baseless such

as when the claims are the product of delusion or fantasy; or (2) the claim is based on an

indisputably meritless legal theory."  *Livingston v. Adirondack Beverage Co.*, 141 F.3d 434, 437

(2d Cir. 1998) (citations and internal quotation marks omitted).  Although extreme caution

should be exercised in ordering *sua sponte* dismissal of a pro se complaint before the adverse

party has been served and the parties have had an opportunity to respond, *Anderson v. Coughlin*,

700 F.2d 37, 41 (2d Cir. 1983), the court still has a responsibility to determine that a claim is not

frivolous before permitting a plaintiff to proceed.  *See, e.g., Thomas v. Scully*, 943 F.2d 259, 260

(2d Cir. 1991) (per curiam) (holding that a district court has the power to dismiss a complaint *sua*

*sponte* if the complaint is frivolous).

To survive dismissal for failure to state a claim, a complaint must plead enough facts to

state a claim that is "plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570

(2007).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the

court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). While Rule 8(a) of the Federal Rules of Civil Procedure, which sets forth the general rules of pleading, "does not require detailed factual allegations, . . . it demands more than an unadorned, the-defendant-harmed-me accusation." *Id*. In determining whether a complaint states a claim upon which relief may be granted, "the court must accept the material facts alleged in the complaint as true and construe all reasonable inferences in the plaintiff's favor." *Hernandez v. Coughlin*, 18 F.3d 133, 136 (2d Cir. 1994) (citation omitted). "[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id*.

Where a plaintiff proceeds pro se, the pleadings must be read liberally and construed to raise the strongest arguments they suggest. *Sealed Plaintiff v. Sealed Defendant*, 537 F.3d 185, 191 (2d Cir. 2008) (citation omitted). A pro se complaint should not be dismissed "without giving leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated." *Gomez v. USAA Fed. Sav. Bank*, 171 F.3d 794, 795 (2d Cir. 1999) (citation and internal quotation marks omitted). An opportunity to amend is not required where "the problem with [the plaintiff's] causes of action is substantive" such that "better pleading will not cure it." *Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000).

## III. PLAINTIFF'S COMPLAINTS

### A. 42 U.S.C. § 1983 Complaint

Plaintiff alleges that when she calls the police, they refuse to come, lie about coming, or refuse to investigate out of retaliation because she called the police on police officers for running

someone off the road, and taped the beating by the police of a teen on Butternut Street.  (Dkt. No. 1 at ¶ 4.)  Plaintiff alleges that the police also refuse to help her when she walks in the police station, and that her family is victimized by police officers failure to investigate and act on her reports.  *Id*. at ¶ 5.  Plaintiff also alleges that the 911 center personnel try to refuse her calls.  *Id*. at ¶ 4.

The relief sought by Plaintiff is to have the police officers do their jobs, take her reports, and treat Plaintiff and her family with respect.  *Id*. at ¶ 6.  Plaintiff also asks for $3,000,000 in damages.  *Id*.

### B.    Title VII Complaint

Plaintiff alleges retaliatory discrimination against her by Defendants on account of her race or color, income, retaliation, and education in violation of Title VII .  (Dkt. No. 1-1 at ¶ 6.) Plaintiff claims that when she goes to the police station for assistance they refuse help and allow criminals to violate her and her family.  *Id.* at ¶ 8.  She further claims that the police refuse to take her reports, refuse to investigate, refuse to allow her to speak to an investigator, retaliate against her, and allow criminals to get away with violating her.  *Id*. at ¶ 9.  Plaintiff asks that the police officers and 911 operators be held accountable and not retaliate against her, and that she be awarded $3,000,000 in damages.

### C.    ADA Complaint

Plaintiff alleges she is disabled with post traumatic stress disorder, depression, anxiety, arthritis, migraines/brain cancer, lung and heart cancer, a joint disorder, and insomnia.  (Dkt. No. 1-2 at ¶ 4.)   Plaintiff claims that the police have retaliated against her by delaying or not showing up and refusing to take her report and telling her to leave when she comes to the police station.

Plaintiff seeks relief in the form of an end to the retaliation and that the police officers and 911 operators be held accountable. *Id*. at ¶ 7. Plaintiff also seeks $3,000,000 in compensatory damages. *Id*.

## IV.    ANALYSIS

### A.    42 U.S.C. § 1983 Claim

#### 1.    Syracuse Police Department and the Chief of Police

Plaintiff has sued one or the other of, or both the Syracuse Police Department and the Chief of Police. (Dkt. No. 1 at ¶ 3.) Although a municipality is subject to suit pursuant to § 1983, *see Monell v. Dept. of Social Services*, 436 U.S. 658, 690 (1978), a municipal police department does not have the capacity to be sued as an entity separate from the municipality in which it is located. *See Krug v. County of Rennselaer*, 559 F.Supp. 2d 223, 247 (N.D.N.Y. 2008) (citing *Orraca v. City of N.Y.*, 879 F.Supp. 148 (S.D.N.Y. 1995) (police department and police precincts are not suable entities separate from the City)). Therefore, the Court recommends that the Syracuse Police Department be dismissed from the action.

The Court would recommend dismissal of Plaintiff's claim even if Plaintiff had correctly named the City of Syracuse as defendant. Pursuant to the standard for establishing municipality liability laid out in *Monell*, 436 U.S. at 658, in order to set forth a cognizable claim for municipal liability under § 1983, a plaintiff must plead and prove that a deprivation of his constitutional rights "was caused by a governmental custom, policy, or usage of the municipality." *Jones v. Town of East Haven*, 691 F.3d 72, 80 (2d Cir. 2012) (citing *Monell,* 436 U.S. 658); *see also Vippolis v. Village of Haverstraw*, 768 F.2d 40, 44 (2d Cir. 1985) ("The plaintiff must first prove the existence of a municipal policy or custom in order to show that the municipality took some

action that caused his injuries beyond merely employing the misbehaving officer.")  A municipality may be liable for deprivation of constitutional rights under § 1983 for policies or customs resulting in inadequate training, supervision, or hiring when the failure to train, supervise, or hire amounts to deliberate indifference to the rights of those with whom municipal employees will come into contact.  *See City of Canton, Ohio v. Harris*, 489 U.S. 378, 388-89 (1989).  To establish causation, there must "at the very least be an affirmative link between the policy and the particular constitutional violation alleged."  *Oklahoma v. Tuttle*, 471 U.S. 808, 823 (1985).  Plaintiff has failed to identify or allege any facts showing that the alleged refusal of the unidentified Syracuse police officers to take or investigate her reports was connected in any way to the existence of any municipal policy or custom of the City of Syracuse or the result of a failure to properly train, supervise, or hire the police officers.

The Court also recommends dismissal of Plaintiff's claim as against the Chief of the Syracuse Police Department.  "Personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under 1983."  *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994) (internal quotation marks and citations omitted).  "Because vicarious liability is inapplicable to . . . § 1983 suits, a plaintiff must plead that each government-official defendant, through the official's own individual actions, has violated the Constitution."  *Iqbal*, 556 U.S. at 676. ("Government officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of *respondeat superior*.").  "Holding a position in a hierarchical chain of command, without more, is insufficient to support a showing of personal involvement."  *Groves v. Davis*, No. 9:11-CV-1317 (GTS/RFT), 2012 WL 651919, at *6 (N.D.N.Y. Feb. 28,

2012)[3] (citing *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir. 1977)); *see also Richardson v. Goord*, 347 F.3d 431, 435 (2d Cir. 2003) (a "mere 'linkage in the prison chain of command' is insufficient to implicate a state commissioner of corrections . . . in a § 1983 claim") (quoting *Ayers v. Coughlin*, 780 F.2d 205, 210 (2d Cir. 1985)).  Therefore, "a plaintiff must . . . allege a tangible connection between the acts of a defendant and the injuries suffered." *Bass v. Jackson*, 790 F.2d 260, 263 (2d Cir. 1986).

The Second Circuit has held that personal involvement by a supervisor necessary to state a claim under § 1983 may be found where: "(1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring." *Colon,* 58 F.3d at 873.[4] Plaintiff's complaint is devoid of allegations plausibly showing the existence of any of the *Colon* criteria in this case.

As noted above, a pro se plaintiff should generally be granted leave to amend her or his complaint unless the problem with a claim is substantive such that a better pleading will not cure

---

[3]   The Clerk will be directed to provide Plaintiff with copies of all unpublished decisions cited herein in accordance with the Second Circuit's decision in *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam).

[4] The Second Circuit has expressly declined to determine whether *Iqbal* eliminated any of the *Colon* bases for liability.  *See Grullon v. City of New Haven*, 720 F.3d 133, 139 (2d Cir. 2013).

it. *Cuoco,* 222 F.3d at 112. The Court finds that allowing Plaintiff to amend his § 1983 claim against the Police Department and/or its Chief, or the City of Syracuse were it to be named as a party, would be futile in this case. Plaintiff claims that police officers refused to accept and investigate her reports. (Dkt. No. 1.) However, it is well established that "[t]here is no . . . constitutional right to an investigation by government officials." *Troy v. City of New York*, No. 13-cv-5082 (AJN), 2014 WL 4804479, * 6 (S.D.N.Y. Sept. 25, 2014) (quoting *Stone v. Dept. of Investigation of City of New York,* No. 91-cv-2471 (MBM), 1992 WL 25202, at * 2 (S.D.N.Y. Feb. 4, 1992)); *see also Harrington v. Cnty. of Suffolk*, 607 F.3d 31, 35-36 (2d Cir. 2010) (finding that parents did not have a protected property interest in an investigation into their son's death); *Rodrigues v. Village of Larchmont*, N.Y., 608 F.Supp. 467, 472 (S.D.N.Y. 1985) (dismissal of claim against police department for refusing to allow plaintiff to file a complaint and refusal to investigate on the ground that "[t]here is certainly no constitutional right to be protected from criminal activity").

In light of the foregoing, the Court recommends that the dismissal of Plaintiff's § 1983 claim against the Syracuse Police Department (City of Syracuse) and the Chief of Police be with prejudice.

### 2.      911 Call Center

Plaintiff has also sued the 911 Administration Center, alleging that call officers tried to refuse to take her calls. (*See generally* Dkt. No. 1.) As with the Syracuse Police Department, the Department of Emergency Communication -- 911 Center ("911 Call Center") is not an independent suable entity but rather a department of Onondaga County. *See* http:.www. ongov.net/911/ (last visited on July 20, 2016). Therefore, the proper defendant with respect to

Plaintiff's claim against the 911 Call Center would be Onondaga County, and the Court recommends dismissal of the three complaints against the 911 Administration Center. *See, e.g., Pazaras v. Onondaga County*, No. 5:14-CV-1227 (DNH), 2016 WL 297423 (N.D.N.Y. Jan. 25, 2016) (Onondaga County the named defendant on a claim against the Onondaga County 911 Call Center).

The Court would recommend dismissal of Plaintiff's claim even if Plaintiff had correctly named Onondaga County as defendant. The complaint does not contain allegations plausibly showing that the alleged deprivation of Plaintiff's constitutional rights with respect to the 911 Call Center "was caused by a governmental custom, policy, or usage of [the County of Onondaga]," *Jones,* 691 F.3d at 80, or inadequate training, supervision, or hiring of 911 Call Center call operators. Plaintiff's complaint does not allege facts describing the reason or reasons for her calls to the 911 Center. (*See* Dkt. No. 1.) Moreover, the sole allegation in Plaintiff's complaint as to the 911 Center call officers is that "the 911 center personal (sic) try to refuse my calls and I am tired of the retaliation." which Plaintiff has alleged is for her reports to the police of police misconduct. Plaintiff has not alleged that she sustained any damages as a result of the call operations trying not to take her calls, and damages is an element of claims under § 1983. *See Doe v. City of Waterbury*, 453 F. Supp. 2d 537, 542 (D. Conn. 2006).

Because there are no allegations in Plaintiff's complaint from which the Court could surmise that if granted leave to amend to name Onondaga County as a defendant and state a municipal liability claim against the County under § 1983, she might be able to do so, the Court recommends that Plaintiff's § 1983 claim against the 911 Administration Center (Onondaga County) be dismissed with prejudice.

**B.      Title VII Claim**

In what Plaintiff has labeled a Title VII claim, she alleges that the police turn her away and refuse to take her reports, refuse to investigate, refuse to allow her to speak to an investigator, retaliate against her, and allow criminals to get away with violating her rights.  (*See generally* Dkt. No. 1-1.)  Under Title VII, it is unlawful for an employer to discriminate against any individual with regard to compensation and terms, conditions, or privileges of employment because of the individual's race, color, religion, sex, or national origin.  42 U.S.C. § 2000e-2(a)(1).  In order to state a claim under Title VII, Plaintiff must show that she was a member of a protected class, she was qualified for a position of employment, she suffered an adverse employment action, and the adverse action occurred under circumstances giving rise to an inference of discriminatory intent.  *Roge v. NYP Holdings, Inc*., 257 F.3d 164, 168 (2d Cir. 2001).

Plaintiff has alleged that she is a member of a protected class (race or color).  However, there are no allegations in the complaint plausibly showing that the allegations against Defendants have anything whatsoever to do with an employment situation or with employment discrimination.  Furthermore, individuals are not subject to liability under Title VII; thus to the extent Plaintiff intends to assert a Title VII claim, including any retaliation claim against the Syracuse Police Chief, she would be unable to do so in any event.  *Sassaman v. Gamache*, 566 F.3d 307, 315-16 (2d Cir. 2009) (quoting *Patterson v. County of Oneida*, 375 F.3d 206, 221 (2d Cir. 2004)).

Based upon the foregoing, the Court recommends that Plaintiff Title VII complaint (Dkt. No. 1-1) be dismissed with prejudice.

## C.     ADA Claim

In her ADA complaint, Plaintiff alleges numerous physical and mental disabilities.  (Dkt. No. 1-2 at ¶46.)  The sole allegations in the complaint are that when Plaintiff calls the police for assistance, the officers delay or do not show up, and when she goes to the police station, they refuse to take her report and tell her to leave the building.  *Id*. at ¶ 6.  Plaintiff does not allege facts plausibly showing a relationship between her disabilities and the police officers' actions. Although Plaintiff seeks damages from the 911 Administration Center, there are no factual allegations of wrongdoing by the 911 Call Center in the complaint.  (*See generally* Dkt. No. 1-2.)

The ADA provides protection against discrimination based upon disability.  42 U.S.C. § 12101, *et seq*.  Title II of the ADA, which covers public services and programs, is the only section of the ADA that could conceivably apply to Plaintiff's claim.  42 U.S.C. § 12182.  Title II provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."  *Id*.

To state a claim under Title II of the ADA, Plaintiff "must demonstrate that (1) [she is a] qualified individual with a disability; (2) that defendants are subject to the ADA ; and (3) that [she was] denied the opportunity to participate or benefit from defendants' services, programs, or activities, or [was] discriminated against by defendants, by reason of [her] disabilities." *Henrietta D. v. Bloomberg*, 331 F.3d 261, 272-73 (2d Cir. 2003).  "Qualified individual with a disability" has been defined by Congress to refer to apply to "an individual with a disability who . . . meets the essential eligibility requirements" established for receipt of services, programs, or activities provided by a public entity.  42 U.S.C. §12132(2).  "Public entity" is defined as "any

12

State or local government; any department, agency, special purpose district, or other instrumentality of a State or States or local government . . . ."  42 U.S.C. § 12131.

Actions of police departments have been found to fall within the scope of ADA Title II, although as discussed above, the City of Syracuse would be the proper party defendant.  *See Williams v. City of New York*, 121 F.Supp. 3d 354, 364 (S.D.N.Y. 2015).  The Onondaga County 911 Call Center also falls within the Title II definition of public entity, although Onondaga County would be the proper party defendant.  Parties, including the Syracuse Chief of Police Department, may not be sued for violations of ADA Title II in their individual capacities inasmuch as the provision provides for suit only against public entities.  *See Green v. City of New York*, 465 F.3d 65, 76 (2d Cir. 2006) (ADA claim dismissed against individual defendant because an individual is not a public entity.)

Even assuming for purposes of this initial review that Plaintiff is a qualified individual with a disability and the Syracuse Police Department and Onondaga County are public entities under Title II of the ADA, Plaintiff has failed to allege facts plausibly showing that she was denied the opportunity to participate or benefit from defendants' services, programs, or activities, or was discriminated against by the Syracuse Police of the Onondaga County 911 Call Center by reason of her alleged disabilities.  To the contrary, Plaintiff has alleged in her 42 U.S.C. § 1983 complaint that the police officers' actions were acting in retaliation for her reporting of police misconduct.  (Dkt. No. 1 at ¶ 4.)  Her complaint under Title II of the ADA contains no factual allegations of wrongdoing whatsoever by the 911 Call Center.  (Dkt. No. 1-2.)  Furthermore, as with the police officers, Plaintiff attributes the 911 callers' attempts to avoid her calls to retaliation for reporting police misconduct.  (Dkt. No. 1 at ¶ 4.)

Based upon the foregoing, the Court recommends dismissal of Plaintiff's third complaint for failure to state a claim. Because Plaintiff has clearly attributed the police officers' and the 911 operators' allegedly wrongful actions to retaliation for reporting police misconduct, and not her alleged disabilities, the Court recommends that the dismissal be with prejudice.

### D. Motion for Appointment of Counsel

Plaintiff has moved for appointment of counsel and submitted correspondence from attorneys declining her request for representation in support of her motion. (Dkt. No. 4.) Even if the Court were not recommending dismissal of Plaintiff's Complaint with prejudice, a more fully developed record would be necessary before an assessment can be made as to whether counsel should be appointed. *See Hendricks v. Coughlin*, 114 F.3d 390, 392 (2d Cir. 1997) (court must look to the likelihood of merit of the underlying dispute in determining whether to appoint counsel). Therefore, the motion is denied. The denial is without prejudice so that Plaintiff will not be precluded from making a subsequent motion for appointment of counsel in the event the District Court allows the action to proceed.

**ACCORDINGLY**, it is hereby

**ORDERED** that Plaintiff's first IFP Application (Dkt. No. 2) is **GRANTED**; and it is further

**ORDERED** that Plaintiff's second IFP Application (Dkt. No. 2-1) is **DENIED AS MOOT**; and it is further

**ORDERED** that Plaintiff's motion for appointment of counsel (Dkt. No. 4) is **DENIED WITHOUT PREJUDICE**; and it is

**RECOMMENDED** that Plaintiff's civil rights complaint 42 U.S.C. § 1983 complaint

(Dkt. No. 1) be **DISMISSED WITH PREJUDICE** upon initial review under 28 U.S.C. § 1915(e); and it is further

 **RECOMMENDED** that Plaintiff's Title VII complaint (Dkt. No. 1-1) be **DISMISSED WITH PREJUDICE** upon initial review under 28 U.S.C. § 1915(e); and it is further

 **RECOMMENDED** that Plaintiff's Title II of the ADA complaint (Dkt. No. 1-2) be **DISMISSED WITH PREJUDICE** upon initial review under 28 U.S.C. § 1915(e); and it is further

 **ORDERED**, that the Clerk send Plaintiff a copy of this Order and Report-Recommendation, along with copies of the unpublished decisions cited herein, in accordance with the Second Circuit decision in *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam).

 Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. <u>**FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW**</u>. *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Secretary of Health and Human Services*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72.

Dated: July 22, 2016
  Syracuse, New York

          Thérèse Wiley Dancks
          United States Magistrate Judge

2012 WL 651919
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Kenneth Carl GROVES, Sr., Plaintiff,

v.

Brett DAVIS, Secure Care Treatment Aid; David
W. Sill, Secure Care Treatment Aid; Thomas
Nicolette, RN, Ward Nurse; Charmaine Bill,
Treatment Team Leader; Jill E. Carver, Social
Worker, Primary Therapist; Edwin Debroize,
Psychologist Assist; Jeff Nowicki, Chief of Mental
Health Treatment Serv.; Terri Maxymillian,
Ph.D., Dir. of Mental Health Serv.; Sgt. Sweet,
Security Services, CNYPC; Michael Hogan,
Comm'r, Dep't of Mental Health, Defendants.

No. 9:11–CV–1317 (GTS/RFT).
|
Feb. 28, 2012.

Attorneys and Law Firms

Kenneth Carl Groves, Sr., Marcy, NY, pro se.

### MEMORANDUM DECISION and ORDER

Hon. GLENN T. SUDDABY, District Judge.

**\*1** Currently before the Court, in this *pro se* civil rights
action filed by Kenneth Carl Groves, Sr. ("Plaintiff"),
against numerous employees of New York State or the
Central New York Psychiatric Center ("Defendants"),
are Plaintiff's motion to proceed *in forma pauperis,* his
motion for a temporary restraining order and preliminary
injunction, and his motion for appointment of counsel.
(Dkt.Nos.2, 3, 4.) [1] For the reasons set forth below,
Plaintiff's motion to proceed *in forma pauperis* is granted;
his motion for a preliminary injunction is denied; his
motion for appointment of counsel is denied; Plaintiff's
claims of deliberate indifference to his mental health
needs against Defendants Bill, Carver and DeBroize are
*sua sponte* dismissed with prejudice; Plaintiff's claims
against Defendants Bill, Carver, DeBroize, Nowicki,
Maxymillian, and Hogan arising from their alleged
personal involvement in the August 8, 2011 assault are

*sua sponte* dismissed without prejudice and with leave to
amend in this action in accordance with Fed.R.Civ.P.
15; Sgt. Sweet is *sua sponte* dismissed without prejudice
as a Defendant in this action; the Clerk is directed to
issue summonses, and the U.S. Marshal is directed to
effect service of process on Defendants Davis, Sill, and
Nicolette.

### I. RELEVANT BACKGROUND

On November 7, 2011, Plaintiff commenced this action
*pro se* by filing a civil rights Complaint, together with
a motion to proceed *in forma pauperis.* (Dkt. Nos.1,
2.) [2] Liberally construed, Plaintiff's Complaint alleges
that the following constitutional violations against him
occurred during his confinement at Central New York
Psychiatric Center ("CNYPC"): (1) Defendants Davis and
Sill used excessive force against him under the Eighth
and/or Fourteenth Amendments; (2) Defendant Nicolette
knew of and failed to take action to protect Plaintiff
from the assault under the Eighth and/or Fourteenth
Amendments; (3) Defendants Bill, Carver, and DeBroize
were deliberately indifferent to his mental health needs
under the Eighth and/or Fourteenth Amendments;
and (4) Defendants Bill, Carver, DeBroize, Nowicki,
Maxymillian, Bosco, and Hogan failed to "adequately
train the staff under their supervision" and to take
appropriate action in response to the incident. (*See
generally* Dkt. No. 1.) For a more detailed description of
Plaintiff's claims, and the factual allegations giving rise to
those claims, the reader is referred to Part III.B of this
Decision and Order.

### II. MOTION TO PROCEED *IN FORMA PAUPERIS*

Because Plaintiff sets forth sufficient economic need, the
Court finds that Plaintiff may properly commence this
action *in forma pauperis.* (Dkt. No. 2.)

### III. *SUA SPONTE* REVIEW OF PLAINTIFF'S
COMPLAINT

In light of the foregoing, the Court must now review the
sufficiency of the allegations that Plaintiff has set forth in
his Complaint in light of 28 U.S.C. § 1915(e)(2)(B). This is
because Section 1915(e)(2)(B) directs that, when a plaintiff
seeks to proceed *in forma pauperis,* "(2) ... the court shall
dismiss the case at any time if the court determines that
—... (B) the action ... (i) is frivolous or malicious; (ii) fails
to state a claim on which relief may be granted; or (iii)

seeks monetary relief against a defendant who is immune from such relief." 28 U.S.C. § 1915(e)(2)(B). [3]

### A. Governing Legal Standard

**\*2** It has long been understood that a dismissal for failure to state a claim upon which relief can be granted, pursuant to Fed.R.Civ.P. 12(b)(6), can be based on one or both of two grounds: (1) a challenge to the "sufficiency of the pleading" under Fed.R.Civ.P. 8(a)(2); or (2) a challenge to the legal cognizability of the claim. *Jackson v. Onondaga Cnty.,* 549 F.Supp.2d 204, 211, nn. 15–16 (N.D.N.Y.2008) (McAvoy, J., adopting Report–Recommendation on *de novo* review).

Because such dismissals are often based on the first ground, a few words regarding that ground are appropriate. Rule 8(a)(2) of the Federal Rules of Civil Procedure requires that a pleading contain "a *short and plain* statement of the claim *showing* that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2) [emphasis added]. In the Court's view, this tension between permitting a "short and plain statement" and requiring that the statement "show[ ]" an entitlement to relief is often at the heart of misunderstandings that occur regarding the pleading standard established by Fed.R.Civ.P. 8(a)(2).

On the one hand, the Supreme Court has long characterized the "short and plain" pleading standard under Fed.R.Civ.P. 8(a)(2) as "simplified" and "liberal." *Jackson,* 549 F.Supp.2d at 212, n. 20 (citing Supreme Court case). On the other hand, the Supreme Court has held that, by requiring the above-described "showing," the pleading standard under Fed.R.Civ.P. 8(a)(2) requires that the pleading contain a statement that "give[s] the defendant *fair notice* of what the plaintiff's claim is and the grounds upon which it rests." *Jackson,* 549 F.Supp.2d at 212, n .17 (citing Supreme Court cases) (emphasis added).

The Supreme Court has explained that such *fair notice* has the important purpose of "enabl[ing] the adverse party to answer and prepare for trial" and "facilitat[ing] a proper decision on the merits" by the court. *Jackson,* 549 F.Supp.2d at 212, n. 18 (citing Supreme Court cases); *Rusyniak v. Gensini,* 629 F.Supp.2d 203, 213 & n. 32 (N.D.N.Y.2009) (Suddaby, J.) (citing Second Circuit cases). For this reason, as one commentator has correctly observed, the "liberal" notice pleading standard "has its limits." 2 *Moore's Federal Practice* § 12.34[1][b] at 12–

61 (3d ed.2003). For example, numerous Supreme Court and Second Circuit decisions exist holding that a pleading has failed to meet the "liberal" notice pleading standard. *Rusyniak,* 629 F. Supp .2d at 213, n. 22 (citing Supreme Court and Second Circuit cases); *see also Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 1949–52, 173 L.Ed.2d 868 (2009).

Most notably, in *Bell Atlantic Corp. v. Twombly,* the Supreme Court reversed an appellate decision holding that a complaint had stated an actionable antitrust claim under 15 U.S.C. § 1. *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). In doing so, the Court "retire[d]" the famous statement by the Court in *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957), that "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Twombly,* 127 S.Ct. at 1968–69. Rather than turn on the *conceivability* of an actionable claim, the Court clarified, the "fair notice" standard turns on the *plausibility* of an actionable claim. *Id.* at 1965–74. The Court explained that, while this does not mean that a pleading need "set out in detail the facts upon which [the claim is based]," it does mean that the pleading must contain at least "some factual allegation[s]." *Id .* at 1965. More specifically, the "[f]actual allegations must be enough to raise a right to relief above the speculative level [to a plausible level]," assuming (of course) that all the allegations in the complaint are true. *Id.*

**\*3** As for the nature of what is "plausible," the Supreme Court explained that "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal,* 129 S.Ct. at 1949. "[D]etermining whether a complaint states a plausible claim for relief ... [is] a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.... [W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged— but it has not show[n]—that the pleader is entitled to relief." *Id.* at 1950 [internal quotation marks and citations omitted]. However, while the plausibility standard "asks for more than a sheer possibility that a defendant has acted unlawfully," *id.,* it "does not impose a probability requirement." *Twombly,* 550 U.S. at 556.

Because of this requirement of factual allegations plausibly suggesting an entitlement to relief, "the tenet that a court must accept as true all of the allegations contained in the complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by merely conclusory statements, do not suffice." *Iqbal,* 129 S.Ct. at 1949. Similarly, a pleading that only "tenders naked assertions devoid of further factual enhancement" will not suffice. *Iqbal,* 129 S.Ct. at 1949 (internal citations and alterations omitted). Rule 8 "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Id.* (citations omitted).

This pleading standard applies even to *pro se* litigants. While the special leniency afforded to *pro se* civil rights litigants somewhat loosens the procedural rules governing the form of pleadings (as the Second Circuit has observed), it does not completely relieve a *pro se* plaintiff of the duty to satisfy the pleading standards set forth in Fed.R.Civ.P. 8, 10 and 12.[4] Rather, as both the Supreme Court and Second Circuit have repeatedly recognized, the requirements set forth in Fed.R.Civ.P. 8, 10 and 12 are procedural rules that even *pro se* civil rights plaintiffs must follow.[5] Stated more simply, when a plaintiff is proceeding *pro se,* "all normal rules of pleading are not absolutely suspended." *Jackson,* 549 F.Supp.2d at 214, n. 28 [citations omitted].[6]

### B. Analysis of Plaintiff's Complaint

The Court prefaces its analysis of Plaintiff's Complaint by noting that, although Plaintiff is a civilly committed sex offender and no longer a prisoner, the Court will look to cases addressing prisoner's rights in analyzing Plaintiff's claims, because "confinement of civilly committed patients is similar to that of prisoners." *Holly v. Anderson,* 04–CV–1489, 2008 WL 1773093, at *7 (D.Minn. Apr.15, 2008); *see also Morgan v. Rabun,* 128 F.3d 694, 697 (8th Cir.1997) ("The governmental interests in running a state mental hospital are similar in material aspects to that of running a prison."). Thus, whereas claims of excessive force by convicted criminals are analyzed under the Eighth Amendment to the United States Constitution, because Plaintiff is a civilly committed sex offender and no longer a prisoner, his substantive rights to be free from unsafe conditions of confinement arise under the Due Process Clause of the Fourteenth Amendment. In *Youngberg v. Romeo,* 457 U.S. 307, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982), the Court stated "[i]f it is cruel and unusual punishment to hold convicted criminals in unsafe conditions, it must be unconstitutional [under the Due Process Clause] to confine the involuntarily committed-who may not be punished at all-in unsafe conditions." *Youngberg,* 457 U.S. at 315–16. As have numerous other courts which have considered the issue, this Court has found that "the standard for analyzing a civil detainee's Fourteenth Amendment [conditions of confinement] claim is the same as the Eighth Amendment standard." *Groves v. Patterson,* 09–CV–1002, Memorandum–Decision and Order at *15–16 (N.D.N.Y. filed Nov. 18, 2009).[7]

### 1. Excessive Force Claims Against Defendants Davis, Still and Nicolette

**\*4** Plaintiff alleges that on August 8, 2011, Defendant Davis entered Plaintiff's dorm room at CNYPC and "viciously attacked and brutally assaulted and battered" him. (Dkt. No. 1 at 4.) During the course of this assault, Defendant Sill is alleged to have entered Plaintiff's room and "jump[ed] on the plaintiff's legs holding and pinning them as Defendant Davis [continued to beat Plaintiff]." (*Id.*) As alleged in the Complaint, although Defendant Nicolette knew in advance that this assault was planned, he "remained in the Nurses Station" and "did nothing to interceed [sic] or stop the brutal attack on the plaintiff." (*Id.* at 5.)

To validly assert a violation of the Eighth Amendment through the use of excessive force, an inmate must allege the following: (1) subjectively, that the defendants acted wantonly and in bad faith; and (2) objectively, that the defendants' actions violated "contemporary standards of decency." *Blyden v. Mancusi,* 186 F.3d 252, 262–63 (2d Cir.1999) (internal quotation marks omitted) (citing *Hudson v. McMillian,* 503 U.S. 1, 8 [1992] ).

Here, construing the factual allegations of Plaintiff's Complaint with special leniency, the Court finds that Plaintiff appears to have alleged facts plausibly suggesting that he was subjected to excessive force by Defendants Davis and Sill. In addition, by alleging that Defendants Davis, Sill and Nicolette discussed the assault in advance of it occurring, and that Nicolette was in the vicinity of Plaintiff's room and had an opportunity to intervene to prevent it, the Complaint sufficiently alleges that

Defendant Nicolette was personally involved and/or failed to protect Plaintiff from the assault. *See Bhuiyan v. Wright,* 06–CV–0409, 2009 WL 3123484, at \*7 (N.D.N.Y. Sept.29, 2009) (Scullin, J.) ("The fact that defendant Davis was not in the room, but was acting as a 'lookout' so that no one came into the room while plaintiff was being beaten, would not absolve him from liability for the assault. An officer's failure to intervene during another officer's use of excessive force can itself constitute an Eighth Amendment violation unless the assault is "sudden and brief," and the defendant had no real opportunity to prevent it."); *Jeffreys v. Rossi,* 275 F.Supp.2d 463, 474 (S.D.N.Y.2003) (holding that an officer may be personally involved in the use of excessive force if he either directly participates in the assault or if he was present during the assault, yet failed to intervene on behalf of the victim, even though the officer had a reasonable opportunity to do so).

As a result, a response to these claims is required from Defendants David, Sill, and Nicolette. In so ruling, the Court expresses no opinion as to whether Plaintiff's claims can withstand a properly filed motion to dismiss or for summary judgment.

## 2. Deliberate Indifference Claims Against Defendants Bill, Carver and DeBroize

Plaintiff alleges that on August 9, 2011, the day after the alleged assault, he attempted to "discuss the incident and what transpired" with Defendants Bill and Carver. (Dkt. No. 1 at 5.) Plaintiff alleges that Defendant Bill told him, "I don't want to discuss this Mr. Groves, we're too busy for your foolishness and the matter is being investigated." (*Id.*) Plaintiff's effort to explain that he was frightened by the incident was rebuffed by Defendant Bill, who told Plaintiff to "grow up." (*Id.* at 5–6.) The following day, Plaintiff attempted to discuss the incident with Defendant Carver, his primary therapist, again without success. A further attempt at discussion later that day was met with Defendant Carver "stating to the plaintiff in a snotty tone 'grow the hell up!' " (*Id.* at 6.) On August 10, 2011, Plaintiff attempted to discuss the incident "and his current fears and feelings," during his Monday afternoon "Process Group," which is facilitated by Defendant DeBroize. As alleged, Defendant DeBroize told Plaintiff and the other group members that the matter was under investigation "so no one could discuss the incident with anyone." (*Id.* at 6.)

\*5 To state a claim of deliberate indifference to a serious medical and/or mental health need under the Eighth Amendment, a plaintiff must first allege facts plausibly suggesting that prison officials acted with "deliberate indifference to serious medical needs." *Estelle v. Gamble,* 429 U.S. 97, 104, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). "[T]he plaintiff must allege conduct that is 'repugnant to the conscience of mankind' or 'incompatible with the evolving standards of decency that mark the progress of a maturing society.' " *Ross v. Kelly,* 784 F.Supp. 35, 44 (W.D.N.Y.), *aff'd,* 970 F.2d 896 (2d Cir.1992) (quoting *Estelle v. Gamble,* 429 U.S. at 102, 105–06). The "deliberate indifference standard embodies both an objective and a subjective prong," both of which the plaintiff must establish. *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994), *cert. denied,* 513 U.S. 1154, 115 S.Ct. 1108, 130 L.Ed.2d 1074 (1995). "First, the alleged deprivation must be, in objective terms, 'sufficiently serious.' " *Id.* (citations omitted). Second, the defendant "must act with a sufficiently culpable state of mind." *Id.*

With regard to the first element, generally, to be sufficiently serious for purposes of the Constitution, a medical condition must be "a condition of urgency, one that may produce death, degeneration, or extreme pain." *Nance v. Kelly,* 912 F.2d 605, 607 (2d Cir.1990) (Pratt, J. dissenting) [citations omitted], *accord, Hathaway,* 37 F.3d at 66; *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998).). [8] Under the subjective component, a plaintiff must also allege facts plausibly suggesting that the defendant acted with "a sufficiently culpable state of mind." *Hathaway,* 37 F.3d at 66. The requisite culpable mental state is similar to that of criminal recklessness. *Wilson v. Seiter,* 501 U.S. 294, 301–03, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991). A physician's negligence in treating or failing to treat a prisoner's medical condition does not implicate the Eighth Amendment and is not properly the subject of a Section 1983 action. *Estelle,* 429 U.S. at 105–06; *Chance,* 143 F.3d at 703. [9]

Here, even when construed with the utmost special liberality, Plaintiff's Complaint fails to allege facts plausibly suggesting that Defendants Bill, Carver, and DeBroize acted with deliberate indifference to Plaintiff's serious mental health condition when they declined to discuss the incident of August 8, 2011. There is nothing in the Complaint that even remotely suggests that the requested conversations were integral to Plaintiff's treatment as a convicted sex offender involuntarily

committed to CNYPC, or that Defendants' refusal to discuss the incident with Plaintiff when he requested to do so caused Plaintiff to suffer any harm or worsening of his condition. In addition, Plaintiff does not allege that any of these Defendants acted with the requisite culpable state of mind.

Moreover, the statements made by Defendants Bill and Carver that he should "grow up," even if construed as verbal harassment, do not give rise to a cognizable claim that may be pursued under Section 1983. Allegations of verbal harassment are insufficient to support a Section 1983 claim. *Johnson v. Eggersdorf,* 8 F. App'x 140, 143 (2d Cir.2001); *see also Purcell v. Coughlin,* 790 F.2d 263, 265 (2d Cir.1986) ("[A]llegations of verbal harassment are insufficient to base a § 1983 claim if no specific injury is alleged .").

**\*6** For these reasons, Plaintiff's deliberate indifference claims against Defendants Bill, Carver, and DeBroize are dismissed pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii) and Fed.R.Civ.P. 12(b)(6). Moreover, because the Court cannot imagine how Plaintiff might correct this claim through better pleading, he is not granted leave to attempt to do so in an amended pleading. [10] Rather, this claim is hereby dismissed with prejudice.

### 3. Failure to Supervise Claims Against Defendants Bill, Carver, DeBroize, Nowicki, Maxymillian, and Hogan

To prevail on a claim under 42 U.S.C. § 1983, a defendant must be personally involved in the plaintiff's constitutional deprivation. *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir.1977). Generally, for purposes of 42 U.S.C. § 1983, supervisory personnel may be considered "personally involved" only if they (1) directly participated in the violation, (2) failed to remedy that violation after learning of it through a report or appeal, (3) created, or allowed to continue, a policy or custom under which the violation occurred, (4) had been grossly negligent in managing subordinates who caused the violation, or (5) exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that the violation was occurring. [11]

Holding a position in a hierarchical chain of command, without more, is insufficient to support a showing of personal involvement. *McKinnon,* 568 F.2d at 934. Rather, a plaintiff must demonstrate " 'a tangible

connection between the acts of the defendant and the injuries suffered.' " *Austin v. Pappas,* 04–CV–7263, 2008 WL 857528, at \*2 (S.D.N.Y. Mar.31, 2008) (quoting *Bass v. Jackson,* 790 F.2d 260, 263 [2d Cir.1986] ) (other citation omitted). An official's failure to respond to grievance letters from inmates, however, "does not establish supervisory liability." *Watson v. McGinnis,* 964 F.Supp. 127, 130 (S.D.N.Y.1997). [12] Moreover, "the law is clear that inmates do not enjoy a constitutional right to an investigation of any kind by government officials." *Pine v. Seally,* 9–CV–1198, 2011 WL 856426, at \*9 (N.D.N.Y. Feb.4, 2011). [13]

In his Complaint, Plaintiff alleges in wholly conclusory terms that Defendants Bill, Carver, DeBroize, Nowicki, Maxymillian, and Hogan failed to "adequately train the staff under their supervision and fail[ed] to act within the scope and training of the position and job title they hold." (Dkt. No. 1 at 8.) Plaintiff alleges that he submitted a letter of complaint to Defendant Hogan and wrote to Defendant Nowicki on several occasions expressing concern his complaint had not been responded to, only to be advised that in September, 2011 that an investigation was ongoing. (*Id.* at 6–7.) Plaintiff does not allege that any of these Defendants personally participated in the alleged assault on August 8, 2011.

Here, even when construed with the utmost special liberality, Plaintiff's Complaint fails to allege facts plausibly suggesting any personal involvement by these Defendants in the alleged used of excessive force on August 8, 2011. As a result, Plaintiff's claims against Defendants Bill, Carver, DeBroize, Nowicki, Maxymillian, and Hogan arising from this incident are *sua sponte* dismissed pursuant to 28 U.S.C. § 1915(e) (2)(B)(ii) and Fed.R.Civ.P. 12(b)(6). This dismissal is without prejudice to Plaintiff's right to file an Amended Complaint that corrects the above-described pleading defects, and states a viable claim against these Defendants. The Court notes that, at this early stage of the case, Plaintiff has the right—without leave of the Court— to file an Amended Complaint within the time limits established by Fed.R.Civ.P. 15(a)(1)(B). However, if he seeks to file an Amended Complaint after those time limits, he must file a motion for leave to file an Amended Complaint in accordance with Fed.R.Civ.P. 15(a)(2). In either event, Plaintiff is advised that *any Amended Complaint must be a complete pleading that will replace and supersede the original Complaint in its entirety, and that*

*may not incorporate by reference any portion of the original Complaint. See* N.D.N.Y. L.R. 7.1(a) (4).

**\*7** Finally, although Plaintiff names Sgt. Sweet as a Defendant in the caption of the complaint and the listing of the parties, he has not set forth in the Complaint any allegations of fact regarding the conduct of this Defendant complained of. (*See generally* Dkt. No. 1.) As a result, the Complaint fails to state a claim upon which relief may be granted and Sgt. Sweet is dismissed from this action without prejudice to Plaintiff's right to file an Amended Complaint as set forth above.

## IV. MOTION FOR INJUNCTIVE RELIEF

A preliminary injunction is an "extraordinary remedy that should not be granted as a routine matter." *Patton v. Dole,* 806 F.2d 24, 28 (2d Cir.1986). In most cases, to warrant the issuance of a preliminary injunction, a movant must show (a) irreparable harm and (b) either (1) a likelihood of success on the merits of the claim or (2) sufficiently serious questions going to the merits, and a balance of hardships tipping decidedly in favor of the moving party. *D.D. ex rel. V.D. v. New York City Bd. of Educ.,* 465 F.3d 503, 510 (2d Cir.2006) (quotation omitted). "The purpose of issuing a preliminary injunction is to 'preserve the status quo and prevent irreparable harm until the court has an opportunity to rule on the ... merits.' " *Candelaria v. Baker,* 00–CV–912, 2006 WL 618576, at \*3 (W.D.N.Y. Mar.10, 2006) (quoting *Devose v. Herrington,* 42 F.3d 470, 471 [8th Cir.1994] ). Preliminary injunctive relief " 'should not be granted unless the movant, by a clear showing, carries the burden of persuasion.' " *Moore v. Consolidated Edison Co. of New York, Inc.,* 409 F.3d 506, 510 (2d Cir.2005) (quoting *Mazurek v. Armstrong,* 520 U.S. 968, 972 [1997] ). "Where there is an adequate remedy at law, such as an award of money damages, injunctions are unavailable except in extraordinary circumstances." *Moore,* 409 F.3d at 510 (citing *Morales v. Trans World Airlines, Inc.,* 504 U.S. 374, 381, 112 S.Ct. 2031, 119 L.Ed.2d 157 (1992). The same standards govern consideration of an application for a temporary restraining order. *Perri v. Bloomberg,* 06–CV–0403, 2008 WL 2944642, at \*2 (E.D.N.Y. Jul.31, 2008) [citation omitted]. The district court has broad discretion in determining whether to grant a preliminary injunction. *Moore,* 409 F.3d at 511.

"The Second Circuit has defined 'irreparable harm' as 'certain and imminent harm for which a monetary

award does not adequately compensate,' noting that 'only harm shown to be non-compensable in terms of money damages provides the basis for awarding injunctive relief.' " *Perri,* 2008 WL 2944642, at \*2 (citing *Wisdom Import Sales Co., L.L.C. v. Labatt Brewing Co., Ltd.,* 339 F.3d 101, 113–14 [2d Cir.2003] ); *see also Kamerling v. Massanari,* 295 F.3d 206, 214 (2d Cir.2002) ("To establish irreparable harm, a party seeking preliminary injunctive relief must show that there is a continuing harm which cannot be adequately redressed by final relief on the merits and for which money damages cannot provide adequate compensation.") (internal quotation omitted). Speculative, remote or future injury is not the province of injunctive relief. *Los Angeles v. Lyons,* 461 U.S. 95, 111–12, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983); *see also Hooks v. Howard,* 07–CV–0724, 2008 WL 2705371, at \*2 (N.D.N.Y. Jul.3, 2008) (citation omitted) ("Irreparable harm must be shown to be imminent, not remote or speculative, and the injury must be such that it cannot be fully remedied by monetary damages.").

**\*8** Plaintiff has submitted a document entitled "Order to Show Cause for Preliminary Injunction and Tempor[ary] Restraining Order." (Dkt. No. 3.) Construed liberally, Plaintiff's submission seeks a temporary restraining order and injunctive relief enjoining Defendants from "submitting and filing false and untrue statements and reports" regarding the August 11, 2011 incident, and to "stop all retaliatory actions against the plaintiff ...." (*Id.* at 1.) Plaintiff also seeks an "Order of Seperation [sic]" directing that Defendants Davis, Sill, Nicolette, Bill, Carver and DeBroize be "restrained from being within 100 feet from the plaintiff in any form or matter." (*Id.* at 2.)

The Court has reviewed Plaintiff's motion papers thoroughly and considered the claims asserted therein in the light most favorable to Plaintiff, as a *pro se* litigant. Based upon that review, the Court finds that the harm Plaintiff alleges is purely speculative and, therefore, not "irreparable." Plaintiff's motion is supported only by a recitation of the alleged assault in August, 2011. (*Id.* at 1–4.) Plaintiff has not supported the claims of ongoing misconduct set forth in his motion papers with any factual allegations, such as the dates on which the misconduct occurred, the nature of the injuries he claims to have suffered, the identities of the persons responsible for the conduct he seeks to enjoin, or the relationship between those actions and the claims asserted in his Complaint. Simply stated, Plaintiff's alleged fear of future

wrongdoing by the Defendants is not sufficient to warrant the extraordinary remedy of preliminary injunctive relief.

The Court further notes that the requested injunctive relief cannot be granted unless there is also proof that Plaintiff has a likelihood of succeeding on the merits of his claim, or evidence that establishes sufficiently serious questions going to the merits of his claim and a balance of hardships tipping decidedly toward him. *See Covino v. Patrissi,* 967 F.2d 73, 77 (2d Cir.1992). Plaintiff has failed to submit *proof or evidence* that meets this standard. Plaintiff's allegations, standing alone, are not sufficient to entitle him to preliminary injunctive relief. *See Ivy Mar Co. v. C.R. Seasons Ltd.,* 907 F.Supp. 547, 561 (E.D.N.Y.1995) ("[B]are allegations, without more, are insufficient for the issuance of a preliminary injunction."); *Hancock v. Essential Resources, Inc.,* 792 F.Supp. 924, 928 (S.D.N.Y.1992) ("Preliminary injunctive relief cannot rest on mere hypotheticals."). Without evidence to support his claims that he is in danger from the actions of anyone at CNYPC, the Court will not credit Plaintiff's conclusory allegations that he will be retaliated against or harmed in the future.

Plaintiff has failed to establish either of the two requisite elements discussed above. As a result, Plaintiff's request for a temporary restraining order and/or injunctive relief is denied.

## V. MOTION FOR APPOINTMENT OF COUNSEL

**\*9** Courts cannot utilize a bright-line test in determining whether counsel should be appointed on behalf of an indigent party. *Hendricks v. Coughlin,* 114 F.3d 390, 392–93 (2d Cir.1997). Instead, a number of factors must be carefully considered by the court in ruling upon such a motion:

> [T]he district judge should first determine whether the indigent's position seems likely to be of substance. If the claim meets this threshold requirement, the court should then consider the indigent's ability to investigate the crucial facts, whether conflicting evidence implicating the need for cross examination will be the major proof presented to the fact finder, the indigent's ability to present the case,

the complexity of the legal issues and any special reason in that case why appointment of counsel would be more likely to lead to a just determination.

*Terminate Control Corp. v. Horowitz,* 28 F.3d 1335, 1341 (2d Cir.1994) (quoting *Hodge v. Police Officers,* 802 F.2d 58, 61 [2d Cir.1986] ). This is not to say that all, or indeed any, of these factors are controlling in a particular case. [14] Rather, each case must be decided on its own facts. *Velasquez v. O'Keefe,* 899 F.Supp. 972, 974 (N.D.N.Y.1995) (McAvoy, C.J.) (citing *Hodge,* 802 F.2d at 61).

Upon due consideration, the Court finds that the relevant factors weigh decidedly against granting Plaintiff's motion at this time. For example, the Court finds as follows: (1) the case does not present novel or complex issues; (2) it appears to the Court as though, to date, Plaintiff has been able to effectively litigate this action; (3) while it is possible that there will be conflicting evidence implicating the need for cross-examination at the time of the trial, as is the case in many actions brought under 42 U.S.C. § 1983 by *pro se* litigants, "this factor alone is not determinative of a motion for appointment of counsel," *Velasquez,* 899 F.Supp. at 974; (4) if this case survives any dispositive motions filed by Defendants, *it is highly probable that this Court will appoint trial counsel at the final pretrial conference;* (5) this Court is unaware of any special reasons why appointment of counsel at this time would be more likely to lead to a just determination of this litigation; and (6) Plaintiff's motion for counsel is not accompanied by documentation that substantiates his efforts to obtain counsel from the public and private sector.

For these reasons, Plaintiff's motion for the appointment of counsel is denied without prejudice. After the Defendants have responded to the allegations in the Complaint which survive *sua sponte* review, and the parties have undertaken discovery, Plaintiff may file a second motion for the appointment of counsel, at which time the Court may be better able to determine whether such appointment is warranted in this case. Plaintiff is advised that any second motion for appointment of counsel must be accompanied by documentation that substantiates his efforts to obtain counsel from the public and private sector.

**\*10  ACCORDINGLY,** it is

**ORDERED** that Plaintiff's motion to proceed *in forma pauperis* (Dkt. No. 2) is **GRANTED;** [15] and it is further

**ORDERED** that Plaintiff's motion for injunctive relief (Dkt. No. 3) is **DENIED;** and it is further

**ORDERED** that Plaintiff's motion for appointment of counsel (Dkt. No. 4) is **DENIED without prejudice;** and it is further

**ORDERED** that Plaintiff's claims of deliberate indifference against Defendants Bill, Carver and DeBroize are *sua sponte* **DISMISSED with prejudice** pursuant to 28 U.S.C. § 1915(e)(2) (B)(ii) and Fed.R.Civ. 12(b)(6); and it is further

**ORDERED** that Plaintiff's claims against Defendants Bill, Carver, DeBroize, Nowicki, Maxymillian, and Hogan arising from their alleged personal involvement in the August 8, 2011 incident are *sua sponte* **DISMISSED without prejudice and with leave to amend** in this action in accordance with Fed.R.Civ.P. 15 (as described above in Part III.B.3. of this Decision and Order), pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii) and Fed.R.Civ. 12(b)(6); and it is further

**ORDERED** that Defendant Sweet is *sua sponte* **DISMISSED without prejudice and with leave to be reinstated** as a Defendant in this action in accordance with Fed.R.Civ.P. 15, pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii) and Fed.R.Civ. 12(b)(6); and it is further

**ORDERED** that Plaintiff's Complaint (Dkt. No. 1) is otherwise accepted for filing (i.e., as to the claims against Defendants Davis, Sill, and Nicolette arising from the August 8, 2011 incident); and it is further

**ORDERED** that Plaintiff provide a summons, USM–285 form and a copy of the complaint for Defendant Davis, Sill and Nicolette for service, and upon receipt from Plaintiff of the documents required for service of process, the Clerk shall (1) issue summonses and forward them, along with copies of the Complaint to the United States Marshal for service upon the remaining Defendants, and (2) forward a copy of the summons and Complaint by mail to the Office of the New York State Attorney General, together with a copy of this Decision and Order; and it is further

**ORDERED** that, after service of process on Defendants, a response to the Complaint shall be filed by the Defendants or their counsel as provided for in the Federal Rules of Civil Procedure; and it is further

**ORDERED** that all pleadings, motions and other documents relating to this action be filed with the Clerk of the United States District Court, Northern District of New York, 7th Floor, Federal Building, 100 S. Clinton St., Syracuse, New York 13261–7367. **Any paper sent by a party to the Court or the Clerk must be accompanied by a certificate showing that a true and correct copy of it was mailed to all opposing parties or their counsel. Any document received by the Clerk or the Court which does not include a certificate of service showing that a copy was served upon all opposing parties or their attorneys will be stricken from the docket .** Plaintiff must comply with any requests by the Clerk's Office for any documents that are necessary to maintain this action. All parties must comply with Local Rule 7.1 of the Northern District of New York in filing motions. **Plaintiff is also required to promptly notify, in writing, the Clerk's Office and all parties or their counsel of any change in Plaintiff's address; his failure to so may result in the dismissal of this action.** All motions will be decided on submitted papers without oral argument unless otherwise ordered by the Court.

**All Citations**

Not Reported in F.Supp.2d, 2012 WL 651919

Footnotes

1     This is the fourth civil rights action filed by Plaintiff in this District. Generally, two of these actions arose out of Plaintiff's refusal to consent to a strip search and the subsequent actions taken against Plaintiff as a result of his refusal. *See Groves v. New York,* 09–CV–0406, Decision and Order (N.D.N.Y. filed May 11, 2009) (Hurd, J.) (*sua sponte* dismissing complaint pursuant to 28 U.S.C. § 1915[e][2][B] ); *Groves v. The State of New York,* 9:09–CV–0412, Decision and Order (N.D.N.Y. filed Mar. 26, 2010) (Sharpe, J.) (granting defendants' motion to dismiss the complaint pursuant to Fed.R.Civ.P. 12[b][6] ).

The third action alleged numerous violations of Plaintiff's constitutional rights during the period July 23, 2009, and August 26, 2009, and was dismissed without prejudice upon Plaintiff's request in October, 2010. *See Groves v. Maxymillian,* 9:09–CV–1002, Decision and Order (N.D.N.Y. filed Oct. 8, 2010) (Suddaby, J.). As a result, it does not appear that the current action is barred because of res judicata, collateral estoppel, and/or the rule against duplicative litigation.

2   At that time, Plaintiff also filed motions for injunctive relief and for appointment of counsel. (Dkt.Nos.3, 4.)

3   The Court notes that, similarly, Section 1915A(b) directs that a court must review any "complaint in a civil action in which a prisoner seeks redress from a governmental entity or officer or employee of a governmental entity" and must "identify cognizable claims or dismiss the complaint, or any portion of the complaint, if the complaint ... is frivolous, malicious, or fails to state a claim upon which relief may be granted; or ... seeks monetary relief from a defendant who is immune from such relief." 28 U.S.C. § 1915A(b).

4   *See Vega v. Artus,* 610 F.Supp.2d 185, 196 & nn. 8–9 (N.D.N.Y.2009) (Suddaby, J.) (citing Second Circuit cases); *Rusyniak,* 629 F.Supp.2d at 214 & n. 34 (citing Second Circuit cases).

5   *See Vega,* 610 F.Supp.2d at 196, n. 10 (citing Supreme Court and Second Circuit cases); *Rusyniak,* 629 F.Supp.2d at 214 & n. 34 (citing Second Circuit cases).

6   It should be emphasized that Fed.R.Civ.P. 8's plausibility standard, explained in *Twombly,* was in no way retracted or diminished by the Supreme Court's decision (two weeks later) in *Erickson v. Pardus,* in which (when reviewing a *pro se* pleading) the Court stated, *"Specific facts are not necessary"* to successfully state a claim under Fed.R.Civ.P. 8(a) (2). *Erickson v. Pardus,* 551 U.S. 89, 93, 127 S.Ct. 2197, 167 L.Ed.2d 1081 (2007) [emphasis added]. That statement was merely an abbreviation of the often-repeated point of law—first offered in *Conley* and repeated in *Twombly*—that a pleading need not "set out *in detail* the facts upon which [the claim is based]" in order to successfully state a claim. *Twombly,* 127 S.Ct. 1965, n. 3 (citing *Conley,* 355 U.S. at 47) [emphasis added]. That statement did not mean that all pleadings may achieve the requirement of "fair notice" without ever alleging any facts whatsoever. Clearly, there must still be enough fact set out (however set out, whether in detail or in a generalized fashion) to raise a right to relief above the speculative level to a plausible level. *See Rusyniak,* 629 F.Supp.2d at 214 & n. 35 (explaining holding in *Erickson* ).

7   *See Weyant v. Okst,* 101 F.3d 845, 856 (2d Cir.1996) ("[W]hile the Supreme Court has not precisely limned the duties of a custodial official under the Due Process Clause to provide needed medical treatment to a pretrial detainee, it is plain that an unconvicted detainee's rights are at least as great as those of a convicted prisoner."); *Walton v. Breeyear,* 05–CV–0194, 2007 WL 446010, at *8, n. 16 (N.D.N.Y. Feb.8, 2007) (Peebles, M.J.) (noting that pretrial detainees enjoy protections under the due process clause of the Fourteenth Amendment parallel to those afforded to sentenced prisoners by the Eighth Amendment); *Vallen v. Carrol,* 02–CV–5666, 2005 WL 2296620, at ——8–9 (S.D.N.Y. Sep.20, 2005) (finding that the Eighth Amendment standard of "deliberate indifference" is the correct one for Section 1983 claims brought by involuntarily committed mental patients based on alleged failures to protect them that violated their substantive due process rights); *Bourdon v. Roney,* 99–CV–0769, 2003 WL 21058177, at *10 (N.D.N.Y. Mar.6, 2003) (Sharpe, M.J.) ("The standard for analyzing a pretrial detainee's Fourteenth Amendment [conditions of confinement] claim is the same as the Eighth Amendment standard.").

8   Relevant factors informing this determination include whether the plaintiff suffers from an injury that a "reasonable doctor or patient would find important and worthy of comment or treatment," a condition that "significantly affects" a prisoner's daily activities, or "the existence of chronic and substantial pain." *Chance,* 143 F.3d at 702.

9   Thus, a physician who "delay[s] ... treatment based on a bad diagnosis or erroneous calculus of risks and costs" does not exhibit the mental state necessary for deliberate indifference. *Harrison,* 219 F.3d at 139. Likewise, an inmate who disagrees with the physician over the appropriate course of treatment has no claim under Section 1983 if the treatment provided is "adequate." *Chance,* 143 F.3d at 703. The word "adequate" reflects the reality that "[p]rison officials are not obligated to provide inmates with whatever care the inmates desire. Rather, prison officials fulfill their obligations under the Eighth Amendment when the care provided is 'reasonable.' " *Jones v. Westchester Cnty. Dept. of Corr.,* 557 F.Supp.2d 408, 413 (S.D.N.Y.2008). In addition, "disagreements over medications, diagnostic techniques (e .g., the need for X-rays), forms of treatment, or the need for specialists or the timing of their intervention are not adequate grounds for a section 1983 claim." *Sonds v. St. Barnabas Hosp. Corr. Health Servs.,* 151 F.Supp.2d 303, 312 (S.D.N.Y.2001). However, if prison officials consciously delay or otherwise fail to treat an inmate's serious medical condition "as punishment or for other invalid reasons," such conduct constitutes deliberate indifference. *Harrison,* 219 F.3d at 138.

10   The Court notes that, generally, leave to amend pleadings shall be freely granted when justice so requires. Fed.R.Civ.P. 15(a). However, an opportunity to amend is not required where amendment would be futile. *John Hancock Mut. Life Ins. Co. v. Amerford Int'l Corp.,* 22 F.3d 458, 462 (2d Cir.1994). *John Hancock Mut. Life Ins. Co.,* 22 F.3d at 462. The Second Circuit has explained that "[w]here it appears that granting leave to amend is unlikely to be productive, ... it is not

an abuse of discretion to deny leave to amend." *Ruffolo v. Oppenheimer & Co.,* 987 F.2d 129, 131 (2d Cir.1993); *see Cuoco v. Moritsugu,* 222 F.3d 99, 112 (2d Cir.2000) ("The problem with [Plaintiff's] cause of action is substantive; better pleading will not cure it. Repleading would thus be futile. Such a futile request to replead should be denied."). This rule is applicable even to *pro se* plaintiffs. *See, e.g., Cuoco,* 222 F.3d at 103.

11  *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995) (adding fifth prong); *Wright,* 21 F.3d at 501 (adding fifth prong); *Williams v. Smith,* 781 F.2d 319, 323–324 (2d Cir.1986) (setting forth four prongs).

12  *See also Gillard v. Rosati,* 08–CV–1104, 2011 WL 4402131, at *7 (N.D.N.Y. Aug.22, 2011) (Peebles, J.) ("It is well-established that without more, 'mere receipt of letters from an inmate by a supervisory official regarding a medical claim is insufficient to constitute personal liability." [internal quotation marks and brackets omitted] ); *Greenwaldt v. Coughlin,* 93–CV–6551, 1995 WL 232736, at *4 (S.D.N.Y. Apr.19, 1995) ("it is well-established that an allegation that an official ignored a prisoner's letter of protest and request for an investigation of allegations made therein is insufficient to hold that official liable for the alleged violations."); *Clark v. Coughlin,* 92–CV 0920, 1993 WL 205111, at *5 n. 2 (S.D.N.Y. Jun.10, 1993) ("Courts in this jurisdiction have consistently held that an inmate's single letter does not constitute the requisite personal involvement in an alleged constitutional deprivation to trigger the Commissioner's liability.")

13  *See also Bernstein v. N.Y.,* 591 F.Supp.2d 448, 460 (S.D.N.Y.2008) ("Courts within the Second Circuit have determined that there is no constitutional right to an investigation by government officials." [internal quotation marks, brackets and ellipsis omitted] ).

14  For example, a plaintiff's motion for counsel must always be accompanied by documentation that substantiates his efforts to obtain counsel from the public and private sector, and such a motion may be denied solely on the failure of the plaintiff to provide such documentation. *See Terminate Control Corp. v. Horowitz,* 28 F.3d 1335, 1341 (2d Cir.1994); *Cooper v. Sargenti Co., Inc.,* 877 F.2d 170, 172, 174 (2d Cir.1989) [citation omitted].

15  Plaintiff should note that he will still be required to pay fees that he may incur in this action, including but not limited to copying and/or witness fees.

---

**End of Document**                                             © 2016 Thomson Reuters. No claim to original U.S. Government Works.

2016 WL 297423
United States District Court,
N.D. New York.

Mary Beth Pazaras, Plaintiff,
v.
Onondaga County, Defendant.

5:14–CV–1227
|
Signed January 25, 2016

**Synopsis**

**Background:** Female dispatcher brought Title VII action against county's 911 dispatch center, alleging that dispatch center retaliated against her for filing gender discrimination complaint. Dispatch center moved for summary judgment.

**[Holding:]** The District Court, David N. Hurd, J., held that dispatcher failed to show causal link between her gender discrimination complaint and her receipt of a written reprimand, as required to establish prima facie case of retaliation.

Motion granted.

West Headnotes (5)

**[1]** **Civil Rights**
👉 Retaliation claims

For purposes of a retaliation claim under Title VII, a causal link between protected activity and adverse employment action may be established by either: (1) direct evidence of retaliatory animus directed against plaintiff by defendant employer; or (2) indirect evidence showing that the protected activity was closely followed by discriminatory treatment or through disparate treatment of fellow employees who engaged in similar conduct. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

Cases that cite this headnote

**[2]** **Civil Rights**
👉 Causal connection;temporal proximity

**Counties**
👉 Removal or other adverse action

Female dispatcher failed to show a causal link between her complaint of gender discrimination and her receipt of a written reprimand, as required to establish prima facie case of retaliation under Title VII against county's 911 dispatch center; while dispatcher received reprimand for call that ended in house fire fatality one day after New York State Division of Human Rights (NYSDHR) rejected her complaint, dispatch center's investigation into house fire incident predated dispatcher's filing of the complaint, recommendation to discipline dispatcher was rendered months before dispatch center received NYSDHR's determination, dispatch center did not actually give the reprimand until more than five months after the complaint, dispatcher's supervisor received an oral reprimand for his involvement in the incident, and arbitration decision found that the reprimand was the proper result of dispatcher's actions in response to house fire call. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

Cases that cite this headnote

**[3]** **Civil Rights**
👉 Causal connection;temporal proximity

Employers need not suspend previously planned adverse employment action upon discovering that a Title VII suit has been filed, and their proceedings along lines previously contemplated, though not yet definitely determined, is not evidence whatsoever of causality, for purposes of a retaliation claim. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

Cases that cite this headnote

**[4]** Civil Rights

👉 Weight and Sufficiency of Evidence

Labor and Employment

👉 Matters concluded

A negative arbitration decision rendered under a collective bargaining agreement (CBA) does not preclude a Title VII action by a discharged employee; but an arbitration decision that is not itself subject to a claim of bias will attenuate a plaintiff's proof of the requisite causal link. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

Cases that cite this headnote

**[5]** Federal Civil Procedure

👉 Employees and Employment Discrimination, Actions Involving

Where an arbitrator's decision against a Title VII plaintiff is based on substantial evidence, plaintiff, to survive motion for summary judgment, must proffer strong evidence that the decision was wrong as a matter of fact, for example new evidence not before the tribunal, or that the impartiality of the proceeding was somehow compromised. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

Cases that cite this headnote

**Attorneys and Law Firms**

OFFICE OF JAMES D. HARTT, Attorney for Plaintiff, 70 Linden Oaks, 3rd Floor, Rochester, NY 14625, James D. Hartt, Esq.

ONONDAGA COUNTY DEP'T OF LAW, Attorneys for Defendant, John H. Mulroy Civic Center, 421 Montgomery Street, 10th Floor, Syracuse, NY 13202, Carol L. Rhinehart, Esq.

**MEMORANDUM–DECISION and ORDER**

DAVID N. HURD, United States District Judge

***1** *TABLE OF ABBREVIATIONS*

CBA: Collective Bargaining Agreement

CSEA: Onondaga Local 834 of Civil Service Employees Association, Inc.

E-911: Department of Emergency Communications Control Center

EEOC: Equal Employment Opportunity Commission

NYSDHR: New York State Division of Human Rights

PSD: Public Safety Dispatcher

PSSS: Public Safety Shift Supervisor

QAR: Quality Assurance Review

**I.** *INTRODUCTION*

After a 911 dispatch center call ended with a house fire fatality, the dispatch center engaged in a six month long internal investigation into the event. During the ongoing internal investigation, plaintiff Mary Beth Pazaras, one of the subjects of said investigation, filed gender discrimination complaints against the 911 dispatch center. This is the unfortunate backdrop of the instant action.

Defendant Onondaga County employed plaintiff as a Public Safety Dispatcher at its Department of Emergency Communications Control Center. Plaintiff filed this Title VII action, alleging that her employer retaliated against her for filing gender discrimination complaints with the Onondaga County Department of Personnel and the New York State Division of Human Rights. That is the only cause of action.

Defendant has moved for summary judgment pursuant to Federal Rule of Civil Procedure 56. Plaintiff opposed. Oral argument was heard in Utica, N.Y. on January 8, 2016. Decision was reserved.

**II.** *BACKGROUND*

Unless otherwise noted, the following facts are undisputed.

Defendant is a municipal corporation and operates the Department of Emergency Communications Control Center ("E–911" or "dispatch center"). Plaintiff commenced her employment at E–911 in 1997, as a Public

Safety Telecommunicator. In 1999, she was promoted to civil service Public Safety Dispatcher ("PSD"). Plaintiff has an unremarkable disciplinary history, aside from an oral reprimand for calling a male employee an "ignorant asshole" in 2007 or 2008.

The Commissioner of the 911 dispatch center is responsible for the operation of the call center, establishing and implementing policies and procedures with respect to fire, police and emergency dispatch, and managing necessary staff. Like all employees, plaintiff is required to adhere to E–911 Policy and Procedure Directives Manual, and Onondaga County Work Rules. In accordance with these directives, plaintiff may be subject to disciplinary action. Plaintiff's employment is governed by the collective bargaining agreement ("CBA") between defendant and the Onondaga Local 834 of Civil Service Employees Association, Inc. ("CSEA").

As noted, the instant action stems from a house fire call on November 29, 2012 that ended with a fatality. Plaintiff was the County Fire/EMS Dispatcher on the call. Shortly after the November 29 event, a Quality Assurance Review ("QAR") was conducted per E911 policy. The QAR identified a delay in dispatching appropriate fire resources by plaintiff. [1] As a result of the QAR, the Commissioner asked the Public Safety Shift Supervisor ("PSSS") to conduct a fact-finding investigation. The PSSS returned his report to the Commissioner on December 3, 2012, recommending a full internal investigation of the event based upon his finding of "a nearly five minute delay" in dispatching appropriate fire resources. Def.'s Stmt. Mat. Facts, at ¶ 15.

**\*2** On January 10, 2013, plaintiff was notified that she was the subject of an internal investigation. On May 7, 2013, defendant alleges plaintiff received an email from the Commissioner, expressing his intention to interview her within a few weeks. Plaintiff disputes this fact, and instead contends that the Commissioner indicated that the investigation was "wrapped up" by May 7. Pl.'s Stmt. Mat. Facts, at ¶ 18.

On June 14, 2013, plaintiff filed an employee harassment and gender discrimination complaint with the Onondaga County Department of Personnel. Plaintiff also filed a complaint with the New York State Division of Human Rights ("NYSDHR") on the same day.

Plaintiff was finally interviewed by the Deputy Commissioner on July 1, 2013, with respect to the November 29, 2012 house fire call. On August 29, 2013, the Commissioner concluded the internal investigation. The investigation found that plaintiff "had violated Department policy and procedure, and work place rules, and [the Commissioner] recommended that disciplinary action be taken with respect to plaintiff." Def.'s Stmt. Mat. Facts, at ¶ 23. The investigation also found fault with plaintiff's shift supervisor, and recommended disciplinary action based upon that individual's violations of department policy and procedure. Defendant contends that the Commissioner next consulted with the Onondaga County Law Department and Department of Personnel regarding the investigation and recommendation.

On December 2, 2013, after completing its investigation, NYSDHR returned a determination. NYSDHR found no probable cause to believe defendant had engaged in the gender discriminatory practices complained of by plaintiff and dismissed her June 14, 2013 complaint. Defendant contends that it received the determination on December 5, 2013, but plaintiff disputes this fact.

On December 3, 2013, defendant issued a written reprimand to plaintiff for her action regarding the November 29, 2012 house fire call. The reprimand was issued within the 15–month statutory time frame set forth in the CBA, and plaintiff challenged this disciplinary action, pursuant to the terms of the CBA. On January 28, 2014, plaintiff filed a second complaint with NYSDHR and EEOC, alleging discrimination based on retaliation. Thereafter, CBA arbitration hearings were conducted on January 15, May 15, and June 8, 2014.

Plaintiff commenced this civil action on October 7, 2014. On September 7, 2015, the arbitrator issued a decision that found plaintiff was, in fact, guilty of the charges alleged in the written reprimand, and that said reprimand was appropriate. At the time of this action, plaintiff is still employed as a PSD by defendant at E–911.

## III. *LEGAL STANDARDS*

### A. Summary Judgment

The entry of summary judgment is warranted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact

and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (citing FED. R. CIV. P. 56(c)); *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A fact is "material" for purposes of this inquiry if it "might affect the outcome of the suit under the governing law." *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505; *see also Jeffreys v. City of* N.Y., 426 F.3d 549, 553 (2d Cir.2005). Such a fact is genuinely in dispute only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505.

**\*3** The party seeking summary judgment bears the burden of informing the court of the basis for the motion and of identifying those portions of the record that the moving party believes demonstrate the absence of genuine issue of material fact as to a dispositive issue. *Celotex,* 477 at 323. If the movant is able to establish a prima facie basis for summary judgment, the burden of production shifts to the party opposing summary judgment, who must produce evidence establishing the existence of a factual dispute that a reasonable jury could resolve in its favor. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *see Anderson,* 477 U.S. at 250, 106 S.Ct. 2505 (stating that once the movant meets its initial burden, the opposing party must show, through affidavits or otherwise, that a material issue of fact remains for trial). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson,* 477 U.S. at 249–50, 106 S.Ct. 2505. Indeed, "the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Id.* at 247–48, 106 S.Ct. 2505.

Importantly, a court considering a motion for summary judgment "cannot try issues of fact; it can only determine whether there are issues to be tried." *Chambers v. TRM Copy Ctrs. Corp.,* 43 F.3d 29, 36–37 (2d Cir.1994) (citations omitted). In making this determination, a court resolves any ambiguities or inferences to be made from the facts in a light most favorable to the non-moving party. *Jeffreys,* 426 F.3d at 553.

**B. Title VII Burden Shifting Analysis**
At the summary judgment stage, Title VII claims are evaluated under the three part "pretext" or *McDonnell Douglas* analysis. *Hicks v. Bains,* 593 F.3d 159, 164 (2d Cir.2010); *see McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802–05 (1973).

The burden shifting analysis begins by requiring the plaintiff to establish a prima facie case of retaliation by a preponderance of the evidence. *See Hicks,* 593 F.3d at 164. Plaintiff's burden in this regard is "de minimis." *Id.* Plaintiff must show: (1) she engaged in protected activity; (2) defendant was aware of said activity; (3) an employment action or decision that was adverse to plaintiff; and (4) a casual link between the protected activity and the adverse employment action. *Kaytor v. Elec. Boat Corp.,* 609 F.3d 537, 552 (2d Cir.2010).

Once plaintiff establishes each essential element of retaliation, the burden shifts to the employer who is then compelled to articulate a legitimate, non-discriminatory reason for the unfavorable employment action it took with respect to the plaintiff. *Richardson v. N.Y. State Dep't of Corr. Servs.,* 180 F.3d 426, 443 (2d Cir.1999). Upon the proffer of a neutral reason, the burden returns to the plaintiff to prove her protected activity was a "but-for" cause of the alleged adverse employment action. *Univ. of Tex. Sw. Med. Ctr. v. Nassar,* —— U.S. ——, 133 S.Ct. 2517, 2533, 186 L.Ed.2d 503 (2013).

**C. Establishing Causation in a Claim for Retaliation**
Since defendant concedes the first three elements of a prima face case, the motion hinges on causation, the fourth and final element of retaliation.

**[1]** A causal link may be established by either: (1) direct evidence of retaliatory animus directed against plaintiff by defendant employer; or (2) indirect evidence showing that the protected activity was closely followed by discriminatory treatment or through disparate treatment of fellow employees who engaged in similar conduct. *See Gordon v. N.Y. City Bd. of Educ.,* 232 F.3d 111, 117 (2d Cir.2000).

Plaintiff has not shown any direct evidence, nor has it shown disparate treatment to support causation. Therefore, the focus must be on whether plaintiff has shown by a preponderance of the evidence that an indirect causal link may be inferred, because her protected activity was followed closely in time by the adverse employment action. *See Thomson v. Odyssey House,* 2015

WL 5561209, at *21–22, 2015 U.S. Dist. LEXIS 125887, at *64 (E.D.N.Y. Sept. 21, 2015).

**\*4** "There is no bright line rule concerning the temporal proximity required to draw the causal inference." *Id.; see, e.g., Gorzynski v. JetBlue Airways Corp.,* 596 F.3d 93, 110–11 (2d Cir.2010) ("Though [the Second Circuit] has not drawn a bright line defining, for the purposes of a prima facie case, the outer limits beyond which a temporal relationship is too attenuated to establish causation, [it has] previously held that five months is not too long to find the causal relationship."); *see also Ruhling v. Tribune Co.,* 2007 WL 28283, at *23 (E.D.N.Y. Jan. 3, 2007) (finding that "a passage of two months between the protected activity and the adverse employment action seems to be the dividing line"); *Cunningham v. Consol. Edison Inc,* 2006 WL 842914, at *19 (E.D.N.Y. Mar. 28, 2006) (same); *Hussein v. Hotel Employees & Rest. Union, Local 6,* 2002 WL 10441 (S.D.N.Y. Jan. 3, 2002) (finding that the passage of more than two months defeats any retaliatory nexus); *Ponticelli v. Zurich Amer. Ins. Group,* 16 F.Supp.2d 414, 436 (S.D.N.Y.1998) (finding that a "two-and-a-half month[ ]" interval "is hardly the close proximity of time ... for allowing a plaintiff to establish the 'causal connection' element") (citation omitted); *see also Hollander v. Amer. Cyanamid Co.,* 895 F.2d 80, 85–86 (2d Cir.1990) (three and a half months insufficient); *Yarde v. Good Samaritan Hosp.,* 360 F.Supp.2d 552, 562 (S.D.N.Y.2005) ("Three months is on the outer edge of what courts in this circuit recognize as sufficiently proximate to admit of an inference of causation."); *Ashok v. Barnhart,* 289 F.Supp.2d 305, 315 (E.D.N.Y.2003) ("[A] period of only two months between a protected activity and an adverse action may permit a reasonable jury to find the acts to be temporally proximate and causally related"); *Nicastro v. Runyon,* 60 F.Supp.2d 181, 185 (S.D.N.Y.1999) ("Claims of retaliation are routinely dismissed when as few as three months elapse between the protected EEO activity and the alleged act of retaliation.").

### IV. *DISCUSSION*

**[2]** The timeline of events is undisputed, but bears repeating here. Defendant began a full internal investigation into the November 29, 2012 house fire call on January 10, 2013. Plaintiff did not engage in protected activity until June 14, 2013, when she filed gender discrimination complaints with the Onondaga County Department of Personnel and New York State

Department of Human Rights ("NYSDHR"). On August 29, 2013, the internal investigation concluded with the recommendation that plaintiff and her supervisor be disciplined. On December 2, 2013, NYSDHR returned a "no probable cause" determination, which essentially "exonerated" the defendant of any wrongdoing with respect to plaintiff's gender discrimination complaint. Defendant disciplined plaintiff through a written reprimand on December 3, 2013.

Plaintiff contends that, by waiting until December 3, 2013 to reprimand plaintiff for the November 29, 2012 events, just one day after NYSDHR returned its rejection of plaintiff's gender discrimination complaint on December 2, 2013, defendant retaliated against plaintiff for filing the gender discrimination complaints.

**[3]** First, the temporal connection is too attenuated. It is undisputed that the protected activity took place when plaintiff filed the complaints on June 14, 2013. However, the investigation predates the complaint and began on January 10, 2013. The investigation concluded on August 29, 2013, with a recommendation to discipline plaintiff. This decision was rendered more than two months after the complaints were filed. However, defendant did not actually issue the written reprimand until more than five months after the complaint. Given this series of events, plaintiff has failed to establish by a preponderance of the evidence that the reprimand was issued *in retaliation for* plaintiff's gender discrimination complaint. At worst, defendant waited for the NYSDHR determination before issuing the reprimand that was planned since August 29, 2013. While this may have been a strategic maneuver, it does not become a retaliatory act or even impermissible. Indeed, "employers need not suspend previously planned [adverse employment action] upon discovering that a Title VII suit has been filed, and their proceedings along lines previously contemplated, though not yet definitely determined, is not evidence whatsoever of causality." *Clark Cnty. Sch. Dist. v. Breeden,* 532 U.S. 268, 272, 121 S.Ct. 1508, 149 L.Ed.2d 509 (2001).

Likewise, the scope of protected activity does not include an agency determination. Plaintiff's "protected activity" occurred when she filed the two gender discrimination complaints on June 14, 2013, and was not extended to December 2, 2013, when NYSDHR rendered its "no probable cause determination." The litany of cases cited supra look to *plaintiff's activities* when establishing a

temporal connection between the protected activity and the adverse employment action. There is no temporal connection between the June 14, 2013 complaint and the December 3, 2013 reprimand.

**\*5** Second, even assuming, arguendo, that defendant delayed reprimanding plaintiff until it received the NYSDHR determination, there are other factors that militate against finding a causal link between her complaint and the written reprimand. For example, plaintiff's supervisor received an oral reprimand for his involvement in the November 29, 2012 event. Thus, plaintiff was not singled out by the investigation, nor was she the only person reprimanded as a result. Moreover, defendant may have delayed reprimanding plaintiff until it received the NYSDHR determination, but plaintiff has failed to show that this determination was the sole or even the motivating factor for her reprimand. In fact, defendant recommended discipline months before receiving the determination.

**[4]** **[5]** And even crediting plaintiff's arguments that the timing is inherently suspect, defendant was squarely within the 15–month statute of limitations for issuing a reprimand. Likewise, plaintiff willingly engaged in arbitration pursuant to the terms of her collective bargaining agreement ("CBA"). The arbitration determination of September 7, 2015 is a post facto justification of defendant's decision to discipline plaintiff. Specifically, the arbitrator found that plaintiff was guilty of the charges of the written reprimand and that the reprimand was appropriate. However, a negative arbitration decision rendered under a CBA does not preclude a Title VII action by a discharged employee. *Alexander v. Gardner–Denver,* 415 U.S. 36, 60 n. 21, 94 S.Ct. 1011, 39 L.Ed.2d 147 (1974). But an arbitration decision "that is not itself subject to a claim of bias

will attenuate a plaintiff's proof of the requisite causal link." *Collins v. N. Y. City Transit Auth.,* 305 F.3d 113, 119 (2d Cir.2002). Where the arbitrator's decision is based on substantial evidence, plaintiff must proffer "strong evidence that the decision was wrong as a matter of fact—e.g. new evidence not before the tribunal—or that the impartiality of the proceeding was somehow compromised." *Id.* Plaintiff has failed to show, aside from a few conclusory allegations, that the arbitration was compromised. Thus, plaintiff is bound by the arbitration decision that the reprimand was, in fact, the proper result of her actions in response to the house fire call of November 29, 2012.

## V. *CONCLUSION*

As a result, plaintiff has failed to show by a preponderance of the evidence that there was a causal link between the filing of her gender discrimination complaint on June 14, 2013 and the reprimand of December 3, 2013.

Therefore it is

ORDERED that

1. Defendant's motion for summary judgment is GRANTED; and

2. The complaint is DISMISSED.

The Clerk of the Court is directed to enter judgment accordingly and close the file.

**All Citations**

--- F.Supp.3d ----, 2016 WL 297423

---

Footnotes

1    While not directly relevant to the issue at hand, plaintiff disputes the QAR findings. Plaintiff contends that the delay in dispatch was not a result of her error. Instead plaintiff contends that she contacted the fire department, but did not receive a response. She contends that the Baldwinsville Fire Department failed to acknowledge or respond to her initial dispatch.

---

**End of Document**                    © 2016 Thomson Reuters. No claim to original U.S. Government Works.

Stone v. Department of Investigation of City of N.Y., Not Reported in F.Supp. (1992)

1992 WL 25202

1992 WL 25202
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Richard E. STONE, Plaintiff,
v.
DEPARTMENT OF INVESTIGATION OF
THE CITY OF NEW YORK, Kevin B. Frawley,
Maxine Derkatch, and Elise McKay, Defendants.

No. 91 Civ. 2471 (MBM).
|
Feb. 4, 1992.

**Attorneys and Law Firms**

Richard E. Stone, pro se.

Alan M. Schlesinger, Ira J. Lipton, Ruby Bradley, Assistants to the Corporation Counsel, New York City, for defendants.

OPINION AND ORDER

MUKASEY, District Judge.

**\*1** Plaintiff, Richard E. Stone, is a former employee of the Department of Consumer Affairs of the City of New York ("Consumer Affairs") and the Department of Finance of the City of New York ("Finance"). He sues the City's Department of Investigation ("DOI"), DOI's Commissioner Kevin B. Frawley, and DOI investigators Maxine Derkatch and Elise McKay, for failure to conduct an adequate investigation into retaliatory actions allegedly taken against him by Consumer Affairs and Finance officials. Defendants move pursuant to Fed.R.Civ.P. 12(b)(6) to dismiss the complaint. For the reasons stated below, defendants' motion is granted.

I

On August 31, 1984, plaintiff, a Consumer Affairs inspector, and Gilbert Laws, another inspector, investigated an outdoor church-sponsored fair in the Bronx for compliance with Consumer Affairs regulations. According to a letter written by Sister Thomas of Saint Athanasius Convent, plaintiff was abusive to the Sister

and other organizers of the fair, and "his manner, deportment and tone of voice was most offensive and unbecoming that of a public representative." (Stone Aff. Ex. 5) Following their investigation of the church fair, Stone and Laws visited the Eagle's Nest, a tavern in Manhattan. Stone, who claims he witnessed two men dancing to recorded music, served the manager of the Eagle's Nest with a summons for operating an unlicensed cabaret. (Stone Aff. ¶ 5)

Because of complaints lodged with Consumer Affairs by Sister Thomas and employees of the Eagle's Nest, disciplinary charges were filed against plaintiff. In April 1985, following hearings in front of Administrative Law Judge McFaul, plaintiff was suspended for 30 days without pay. (Complaint. Ex. B) Plaintiff subsequently complained to DOI, claiming that he was being harassed by Consumer Affairs officials. Specifically, plaintiff claimed that Bruce Kato, Inspector General at Consumer Affairs and a former employee of DOI, was "conducting a campaign of harassment" against him, which included suborning perjury on behalf of Inspector Laws. (Complaint Ex. A) The allegations were reviewed by DOI and no action taken. (Complaint Ex. F)

In 1986, plaintiff transferred to Finance as a probationary Fraud Investigator. That September, Bruce Kato became Assistant Commissioner of Finance, which caused plaintiff "an extreme feeling of anxiety and discomfort." (Stone Aff. ¶ 11) Plaintiff informed DOI of Kato's transfer. (Id.) Shortly thereafter, plaintiff was called into his supervisor's office, where, in the presence of Kato, he was asked to agree to an extension of his probationary period. (Id.) Plaintiff refused and on December 11, 1988 was terminated. (Complaint Ex. D)

In March 1989, DOI investigated plaintiff's termination. After taking sworn testimony from several witnesses and reviewing all documents provided by plaintiff, DOI officials concluded that there was no evidence that Bruce Kato or any other officials sought to retaliate against plaintiff. Nor was there any evidence of either gross mismanagement or abuse of authority. Instead, "the evidence indicates that there were independent objective bases for [the] termination." (Complaint Ex. I)

**\*2** Plaintiff also filed a retaliation claim with the State of New York Division of Human Rights, claiming that his termination was based on his earlier complaints against

Stone v. Department of Investigation of City of N.Y., Not Reported in F.Supp. (1992)

1992 WL 25202

Kato. The Division of Human Rights rejected his claim. Plaintiff then filed suit in the Supreme Court of the State of New York against Finance asserting that he was terminated in bad faith. The claim was dismissed. Thereafter, he filed suit against Finance in this Court seeking monetary damages and reinstatement. That suit was dismissed after the court determined that plaintiff's claim was barred by res judicata. *Stone v. Department of Finance, City of New York,* 90 Civ. 5283 (S.D.N.Y.1990).

Plaintiff now brings this suit under 42 U.S.C. § 1983, claiming that DOI and three of its employees "unjustifiably delayed investigation of [his] complaints," and then conducted "a perfunctory, cursory and superficial investigation." (Complaint p. 2) He contends that as a result he suffered "retaliatory actions" including suspension from his Consumer Affairs job, harassment, and termination from his position with Finance. (*Id.*) He seeks compensatory and punitive damages and an injunction vacating DOI's findings and referring his complaints to an unspecified neutral authority.

II

Although a *pro se* complaint will be liberally construed, in pleading an action under 42 U.S.C. § 1983 a *pro se* plaintiff has the burden of alleging deprivation of a federally protected right. *Bass v. Jackson,* 790 F.2d 260, 263 (2d Cir.1986); *see Flagg Brothers Inc. v. Brooks,* 436 U.S. 149, 155 (1978). Plaintiff contends that DOI's failure to conduct an adequate investigation deprived him of his rights under the due process and equal protection clauses of the Fourteenth Amendment. (Complaint p. 4) He alleges that as a result of DOI's inaction he was subject to retaliation; specifically, he claims he was harassed and eventually suspended from his job at Consumer Affairs and was fired from his position at Finance.

There is, however, no constitutional right to an investigation by government officials. *Gomez v. Whitney,* 757 F.2d 1005 (9th Cir.1985); *Chapman v. Musich,* 726 F.2d 405 (8th Cir.1984); *see Byrd v. Department of Probation,* 1990 WL 276573, 1991 U.S. Dist. Lexis 3706 (S.D.N.Y.1991). There is "no instance where the courts have recognized inadequate investigation as sufficient to state a civil rights claim unless there was another recognized constitutional right involved." *Gomez,* 757 F.2d at 1005.

Plaintiff cannot claim that the allegedly inadequate investigation deprived him of "another recognized constitutional right." *Id.* First, plaintiff did not have a property interest in his position at Finance. In New York, a public employer may remove a probationary employee for any reason. *York v. McGuire,* 63 N.Y.2d 760 (1984). Therefore, plaintiff had no entitlement to his position at Finance. *Board of Regents v. Roth,* 408 U.S. 564 (1972).

*3 Moreover, plaintiff cannot argue that DOI's allegedly inadequate investigation subjected him to unlawful discrimination or retaliation. As this court recognized in *Stone v. Department of Finance, City of New York,* 90 Civ. 5283 (S.D.N.Y.1990), the Supreme Court of the State of New York has already determined that Finance and its employees, including Bruce Kato, did not act in bad faith in terminating plaintiff. Collateral estoppel prevents plaintiff from relitigating this issue. *Allen v. McCurry,* 449 U.S. 90, 96 (1980). Therefore, even accepting plaintiff's assertion that DOI's investigation was inadequate, he cannot claim that DOI failed to protect him from unlawful discrimination or retaliation at the hands of Finance officials.

Finally, plaintiff cannot raise a claim relating to unlawful retaliation by Consumer Affairs. The statute of limitations in a § 1983 case is three years. *Owens v. Okure,* 488 U.S. 235 (1989). Even accepting plaintiff's assertion that DOI's investigation of his complaints was inadequate, the actions taken by Consumer Affairs and DOI's response to those actions occurred in 1985 and 1986. Therefore, plaintiff's claim regarding DOI's investigation of Consumer Affairs is barred by the statute of limitations.

Because there is no constitutional right to an investigation and because plaintiff cannot claim that DOI's action or inaction deprived him of a recognized constitutional right, the complaint must be dismissed for failure to state a claim on which relief can be granted. Plaintiff may move to replead if he is so disposed. However, as explained above, the defect in this case is not one of pleading; rather, the underlying events, described in detail in the complaint, do not give rise to a claim.

SO ORDERED:

**Stone v. Department of Investigation of City of N.Y., Not Reported in F.Supp. (1992)**

1992 WL 25202

**All Citations**

Not Reported in F.Supp., 1992 WL 25202

---

**End of Document**                                    © 2016 Thomson Reuters. No claim to original U.S. Government Works.

2014 WL 4804479
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Suzannah B. TROY, Plaintiff,
v.
CITY OF NEW YORK, et al., Defendants.

No. 13–cv–5082 (AJN).
|
Signed Sept. 25, 2014.

MEMORANDUM & ORDER

ALISON J. NATHAN, District Judge.

**\*1** This action arises from the investigation of a physical altercation between Plaintiff Suzannah Troy and non-party Delita Hooks by police officers employed by the City of New York ("City"). Plaintiff, proceeding *pro se,* brings this action against the City and individual defendants Lieutenant Agnes, Lieutenant Burgos, Sergeant Chen, Detective Dwyer, IAB Chief Campisi, Commissioner Kelly, Sergeant O'Donnell, and Deputy Inspector Winski, alleging that Defendants violated the federal constitution, the state constitution, and state tort law. Before the Court is Defendants' motion to dismiss the complaint pursuant to Federal Rule of Criminal Procedure 12(b)(6). For the reasons that follow, the motion is granted.

### I. Background

The following facts are taken from the complaint and judicially noticeable documents. *See Kramer v. Time Warner Inc.,* 937 F.2d 767, 773 (2d Cir.1991) (holding that a district court may "consider matters of which judicial notice may be taken" in deciding a motion to dismiss, so long as such extrinsic documents are not relied upon for the truth of the matters asserted therein). But the Court does not rely on factual assertions made for the first time in Plaintiff's opposition brief, *see, e.g.,* Pl. Opp. 4 (asserting for the first time that Plaintiff spoke to Detective Del Pozo about "witnessing a retired NYPD commander attempted [sic] to fix a ticket for Rudin Flunkie"), as it is "axiomatic that the Complaint cannot be amended by briefs in opposition to a motion to

dismiss." *Muniz v. Morillo,* No. 06–cv–6570 (RJS), 2008 WL 4219073, at \*6 (S.D.N.Y. Sept. 10, 2008) (quoting *O'Brien v. Nat'l Prop. Analyst Partners,* 719 F.Supp. 222, 229 (S.D.N.Y.1989)). Indeed, Plaintiff was advised and subsequently reminded of her right to amend the Complaint in the face of the motion to dismiss, *see* Dkt. Nos. 29, 33, but declined to do so, opting instead to rely on the Complaint and oppose the motion, *see* Dkt. No. 40.

### A. Plaintiff's History of Activism

Plaintiff Suzannah Troy defines herself as an activist who has engaged in numerous campaigns involving her local community and the NYPD. Compl. 4. [1] For example, Plaintiff "worked with the NYPD and Parks Dept. to return the doors" to the Tompkins Square Park women's restrooms in August 2009, published a letter in the New York Times advocating raising the salaries of NYPD officers in 2004, and gave free massages to NYPD officers in the lobby of her health club following September 11. Compl. 5–7. Plaintiff has also expressed more critical views of the NYPD, such as by filing a grievance with the Supreme Court Committee related to "the rape trial of NYPD PO Moreno aka the NYPD Rape Cop." Compl. 8–9.

### B. Altercation with Ms. Hooks

Plaintiff is a patient of Dr. Kathleen Vine. Compl. 11. At the time of the events underlying this litigation, Dr. Vine shared offices and a reception area with Dr. Andrew Fagelman, who employed and continues to employ receptionist Delita Hooks. *Id.* On October 1, 2012, Plaintiff stopped by a water cooler in the reception area of Dr. Vine's office on her way out the door. *Id.* Upon noticing that the water cooler was stocked with Styrofoam cups, Plaintiff turned to Ms. Hooks and asked, "Would you consider using paper cups instead of Styrofoam? It's better for the environment." *Id.*

**\*2** While the exact sequence of the events that followed is not entirely clear from Plaintiff's complaint, Plaintiff appears to contend that Ms. Hooks reacted to Plaintiff's request by striking her desk, yelling at Plaintiff, getting up from her desk to approach Plaintiff in a threatening manner, and giving Plaintiff "the finger ." Compl. 11–12. Plaintiff retreated to the hallway and began using her cell phone to record Ms. Hooks through the doorway of the office. *Id.* at 12 Plaintiff said to Ms. Hooks, "[W]ould you please give me the finger again, now I am

filming." *Id.* Instead of closing the door to block Plaintiff's view, the Complaint alleges that Ms. Hooks continued to threaten Plaintiff, stating, "I will slap the crap out of you!" *Id.* According to the Complaint, Ms. Hooks then slapped Plaintiff's cell phone out of Plaintiff's hands, threw her shoe at Plaintiff, punched Plaintiff in the left eye, and dragged Plaintiff toward the elevator by pulling on Plaintiff's hair. *Id.* at 12–13. Plaintiff attempted to defend herself by making short jabs with her bags and her left arm, which was weak due to a recent medical procedure (Plaintiff's right arm was holding her cell phone, which she had apparently retrieved). *Id.* at 13. The attack allegedly culminated with Ms. Hooks pressing her bare foot against Plaintiff's groin while pulling on Plaintiff's hair so that Plaintiff was "bent over like a bridge." *Id.* at 13–14. Ms. Hooks' co-workers and friends were ultimately able to put a stop to the altercation, and Ms. Hooks returned to her desk. *Id.* at 14–15.

**C. Investigation of Altercation**
Immediately after leaving Dr. Vines' office on October 1, 2012, Plaintiff attempted to file a complaint with the 1st Precinct of the New York Police Department by telephone. Compl. 15. When nobody answered her call, she walked to their office and lodged her complaint in person. *Id.;* Nam Decl. Ex. B (Omniform System Complaint Report) ("Complaint Report").

Three days later, on October 4, Detective John Vergona called Plaintiff regarding her complaint. Compl. 18. During their conversation, Plaintiff described the altercation, revealing that she had told the following joke in the doctor's office just before being attacked: "Thank you, I'll see you next summer, and if I can afford injections then I'll get them to attract younger men." *Id* . at 21. Plaintiff alleges that this statement caused Detective Vergona to "develop[ ] a misogynistic attitude towards [her]." *Id.* Detective Vergona informed Plaintiff that he would visit Dr. Vine's office on the following Monday, October 8, to investigate. *Id.* Despite this assurance, Detective Vergona did not visit Dr. Vine's office. *Id.*

Later that same day, Plaintiff called Detective Vergona to provide additional information regarding her case. Compl. 21. Despite Plaintiff's multiple requests, Detective Vergona refused to meet Plaintiff in person to examine her injuries. *Id.* Detective Vergona said to Plaintiff, "I DON'T CARE IF YOU HAVE TWO BLACK EYES. STOP BABBLING." *Id.* at 21–22. At some point, Detective

Vergona told Plaintiff that he would not interview Dr. Fagelman or Dr. Vine because they had not witnessed the altercation. *Id.* at 27. After these initial phone calls, Plaintiff sent Detective Vergona corroborating evidence, including the video recording of the attack, a medical report from Plaintiff's primary care physician documenting her injuries, and photographs of her injuries. *Id.* at 18–19. The photographs of Plaintiff's injuries were attached to her complaint file. *See* Nam Decl., Ex. C.

**\*3** Three days later, on October 7, Plaintiff emailed Detective Vergona to inform him of vulgar and threatening comments that had been left on the video of the altercation, which Plaintiff had uploaded to YouTube. Compl. 23. Detective Vergona never discussed this email with Plaintiff. *Id.*

On October 11, Plaintiff called the 1st Precinct and spoke with Detective Del Pozo in order to request that charges be brought against Ms. Hooks. Compl. 29.

On October 13, Detective Vergona emailed Plaintiff to inform her that he would visit Dr. Fagelman's office the following Monday, October 15, and requesting that she call him that afternoon. Compl. 29. Detective Vergona did not visit Dr. Fagelman's office on October 15, and, furthermore, refused to take Plaintiff's call that afternoon. *Id.* at 29–30.

On October 16, Detective Vergona called Plaintiff to inform her that Ms. Hooks had filed a cross-complaint against her on October 2. Compl. 36. Plaintiff was surprised, as she had not been contacted by the detectives assigned to Ms. Hooks' complaint. *Id.* at 21. Unlike Plaintiff, who was never able to meet with Detective Vergona in person, Ms. Hooks "had a meeting promptly with the NYPD" following the filing of her cross complaint. *Id.* at 46.

Detective Vergona further informed Plaintiff that, if Plaintiff did not drop her complaint against Ms. Hooks, both Plaintiff and Ms. Hooks would be arrested. Compl. 37. Faced with this choice, Plaintiff told Detective Vergona that she would rather be arrested. *Id.* Detective Vergona demanded that Plaintiff turn herself in immediately. *Id.* Although Plaintiff initially agreed to do so, she subsequently realized that she had a conflicting dentist appointment and called Detective Vergona back to reschedule, offering to turn herself in that afternoon

at 3 pm instead. *Id.* at 37–38. Detective Vergona rejected this offer, telling Plaintiff that she should turn herself on October 20, which was a Saturday. *Id.* at 38. Plaintiff objected that she was Jewish and Saturday was the Sabbath, but Detective Vergona refused to reconsider. *Id.*

Plaintiff's impending incarceration caused her to experience mental, emotional, and physical distress. Compl. 38. In particular, Plaintiff was concerned that she would be unable to cope with an existing urinary condition while in prison, which was caused by a collapsed bladder and fibroid tumors. *Id.* at 38. Fearing for her health, Plaintiff, acting through counsel, agreed to withdraw her complaint against Ms. Hooks in exchange for Ms. Hooks doing the same. *Id.* at 38–39.

**D. Concerns Regarding Investigation**
Plaintiff came to suspect that she was being treated unfairly by Detective Vergona and other officers in the 1st Precinct, and she reported these concerns to other authorities during and after the investigation of her complaint. For example, Plaintiff contacted IAB regarding her complaint against Ms. Hooks, such as by sending them medical records documenting her injuries from the altercation. Compl. 19. Plaintiff also contacted IAB regarding the harassing comments she received on the video of the attack posted to YouTube. *Id.* at 24. Although IAB initially told Plaintiff that they would investigate, they subsequently refused to do so upon discovering that the comments had not been left by police officers. *Id.*

**\*4** On October 9, Plaintiff sent then-Commissioner Kelly a package informing him of the NYPD's continued failure to investigate her case, and proposing a series of film festivals called "Project Peace to the Street, Project Hope." Compl. 24–25. Commissioner Kelly never responded. *Id.* at 25. Commissioner Kelly also failed to respond to Plaintiff's request for the badge numbers of Detective Vergona and an officer identified as Sergeant Chen, as did Chief Campisi, Deputy Edward Winski, Sergeant O'Donnell, the Civilian Complaint Review Board, IAB, the detective squad, and the front desk of the 1st precinct. *Id.* Plaintiff encountered similar difficulty ascertaining the identities of Detective Andy Dwyer and his partner, the police officers assigned to investigate Ms. Hooks' cross-complaint: the CCRB, IAB, and "NYC Gov Commission to Combat Police Corruption" all refused to identify the officers or give them their badge numbers. *Id.*

Plaintiff's concerns were only exacerbated by the events surrounding her decision to drop her complaint against Ms. Hooks, and on October 21, Plaintiff contacted IAB to complain that she had been "coerced to drop charges by Det John Vergona." Compl. 43. IAB Sergeant Decker told Plaintiff that everybody involved would be interviewed, and referred her to IAB Lieutenant Agnes. *Id.* However, Lieutenant Agnes never returned Plaintiff's call, and Plaintiff was not interviewed by IAB regarding Detective Vergona's conduct. *Id.* Plaintiff later attempted to report Detective Vergona to the CCRB, but they directed her to IAB against her wishes. *Id.*

At some point, Plaintiff "contacted the Hate Crimes Units ... regarding her allegations of Det VERGONA delaying her unlawful arrest until Saturday, Oct. 20, 2012 and refusing to explain why she had to wait 4 days until the Sabbath." Compl. 32–33. Detective Sanchez from the Hate Crimes Unit directed Plaintiff to file a complaint with a local precinct, and Plaintiff attempted to file such a complaint at the 9th Precinct. *Id.* at 33. She was turned away and directed to IAB instead. *Id.* Plaintiff filed a complaint with IAB regarding Detective Vergona's "anti-Semitism as well as misogyny," but again received no response. *Id.*

On November 18, Plaintiff contacted Deputy Winski to "inform[ ] him that a crime had been committed in the First Precinct and [Ms. Hooks] had walked in and filed [a] false cross complaint." Compl. 40–41. Two days later, on November 20, Plaintiff made similar reports to IAB and Lieutenant Burgos. *Id.* at 41

Plaintiff also attempted to file a complaint regarding Ms. Hooks' allegedly false cross complaint with the 1st Precinct. Compl. 41. Although Sergeant Chen had told Plaintiff that she could do so over the telephone, he refused to speak with her when she came to the station, and Officer Migori turned her away. *Id.* at 41–42. Plaintiff later tried contacting Detective Winski regarding Ms. Hooks' false cross complaint, but she was unable to reach him by telephone, and she was turned away by Sergeant Schwartz when she tried to meet Detective Winski at his office. *Id.* at 42.

**\*5** At some point, Plaintiff retained a private investigator. *See* Compl. 26–27. Plaintiff's private investigator asked Dr. Fagelman, Ms. Hooks' employer, whether he had spoken to the police. *Id.* at 27.

Dr. Fagelman responded, "No comment." *Id.* Plaintiff interpreted this to mean that Dr. Fagelman may have been interviewed in support of Ms. Hooks' cross-complaint. *Id.*

### E. Damages

Plaintiff "suffers many symptoms of Post Traumatic Stress" from Dr. Fagelman's refusal to fire Ms. Hooks, Ms. Hooks' blaming Plaintiff for the attack, the attack itself, and the NYPD and IAB officers' refusal to investigate her claims. Compl. 49. Her symptoms include insomnia, weight gain, and anxiety. *Id.*

### F. Complaint

Plaintiff's Complaint brings claims against the City of New York and police officers Lieutenant Agnes, Lieutenant Burgos, Sergeant Chen, Detective Dwyer, IAB Chief Campisi, Commissioner Kelly, Sergeant O'Donnell, and Deputy Inspector Winski, alleging violation of the following constitutional claims, pursuant to 42 U.S.C. § 1983:(1) the right to be free from retaliation under the First Amendment; (2) the First Amendment right to petition for redress of grievances; (3) "freedom from the threat of lodging false charges ... by police officers in violation of [Plaintiff's] rights to due process, under the Fifth and Fourteenth Amendments"; (4) "freedom from fabrication of evidence against her under the Fifth and Fourteenth Amendments"; (5) equal protection; and (6) failure to intervene. Plaintiff further alleges that the City is liable for these constitutional violations because they "were a direct and proximate result of [its] wrongful *de facto* policies and/or well-settled and widespread customs and practices and of refusal to accept complaints and investigate into officer misconduct and failure to properly supervise, train and discipline police officers." Compl. 57.

Plaintiff also brings the following state law claims: (1) *respondeat superior* liability for the City; (2) violation of the New York State Constitution's guarantee of "freedom from retaliatory arrest, under the Article I, Section 8"; (3) intentional and negligent infliction of emotional distress; (4) negligence; and (5) negligent hiring, screening, retention, supervision and training by the City. Compl. 59–60.

Plaintiff requests that "she be compensated for violation of her constitutional rights, pain, suffering, mental anguish and humiliation," and that she be awarded punitive damages and attorneys' fees and costs. Compl. 60.

### II. Legal Standard

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Hogan v. Fischer,* 738 F .3d 509, 514 (2d Cir.2013) (quoting *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009)). In this context, a claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (quoting *Iqbal,* 556 U.S.at 678). While this standard "is not akin to a 'probability requirement,' " it does demand "more than a sheer possibility that a defendant has acted unlawfully." *Iqbal,* 556 U.S. at 678 (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 556 (2007)). When applying this standard to a complaint filed by a *pro se* litigant, the Court must construe the complaint "liberally with 'special solicitude' and interpret [ ][it] to raise the strongest claims that it suggests ." *Hogan,* 738 F.3d at 515. However, a litigant's *pro se* status does not relieve her of the requirement that her complaint "state a plausible claim for relief." *Id.*

### III. Discussion

### A. Failure to Investigate

**\*6** It is well established that "[t]here is ... no constitutional right to an investigation by government officials." *Stone v. Dept. of Investigation of City of New York,* No. 91–cv–2471 (MBM), 1992 WL 25202, at \*2 (S.D.N.Y. Feb. 4, 1992); *accord Harrington v. Cnty. of Suffolk,* 607 F.3d 31, 35–36 (2d Cir.2010). This is because "the duty to investigate criminal acts (or possible criminal acts) almost always involves a significant level of law enforcement discretion," and individuals accordingly have no " 'legitimate claim of entitlement' to a police investigation." *Harrington,* 607 F.3d at 35 (citing *Town of Castle Rock v. Gonzales,* 545 U.S. 748, 760 (2005)).

This rule requires that Plaintiff's claims be dismissed to the extent that they are based on various defendants' failure to investigate. In Plaintiff's own words, she has brought suit against defendants Campisi, Kelly, Winski, and Sergeant Chen because of their "failure ... to properly investigate or intervene based on plaintiff's reports of Detective Vergona threatening her with an unlawful arrest." Pl. Opp. 15. Likewise, Plaintiff's only allegations against Agnes, Burgos, Dwyer, and O'Donnell's are that they failed to act in response to Plaintiff's complaints. *See, e.g.,*

Compl. 43 (alleging that Agnes failed to contact Plaintiff regarding Defendant Vergona's misconduct), 25 (alleging that Burgos never responded to her email), 18 (alleging that Dwyer failed to "contact[ ] [Plaintiff] to interview her"), 28 (alleging that O'Donnell "was not interesting in investigating why [Plaintiff] would drop charges"). Even Plaintiff's claims against Detective Vergona are, to a significant extent, based upon his failure to adequately investigate her complaint against Ms. Hooks. *See, e.g.,* Compl. 17 (alleging that "Detective Vergona never went to the medical office to interview everybody as he said he would"). Accordingly, Plaintiff's claims against defendants Agnes, Burgos, Campisi, Chen, Dwyer, Kelly, O'Donnell, and Winski must be dismissed for failure to state a claim, as must Plaintiff's claims against Detective Vergona, to the extent they are predicated on his failure to investigate her complaint against Ms. Hooks.

## B. First Amendment

Plaintiff alleges that that Defendants deprived her of her First Amendment rights to be free from retaliation and to "petition for redress of grievances." Compl. 52–53. While the Complaint fails to identify either what has been done to Plaintiff that violates these rights, or which defendants were responsible for that action, the Court construes Plaintiff to allege that she engaged in conduct protected by the First Amendment by filing a police complaint against Ms. Hooks and engaging in various forms of political activism, and that Detective Vergona unlawfully retaliated against Plaintiff for these exercises of her First Amendment rights by rudely telling her to "stop babbling," and by informing Plaintiff that she herself would face arrest if she proceeded with her complaint against Ms. Hooks. *See* Pl. Opp. 18–19 (citing these allegations in the complaint as the basis for her First Amendment claim). For the reasons that follow, Plaintiff's First Amendment claims are dismissed.

### 1. Rude Comment

**\*7** Plaintiff's opposition brief makes clear that her First Amendment claim is based, in part, on Detective Vergona's having told her to "stop babbling" during their October 4, 2014, telephone conversation. *See* Pl. Opp. 19; Com pl. 21–22. However, any such claim must be dismissed out of hand, as "[m]ere rudeness or inconvenience, however unpleasant," cannot give rise to an injury cognizable under the First Amendment. *Batista v. Rodriguez,* 702 F.2d 393, 398 (2d Cir.1983) (finding that

administrative tribunal's rude treatment of plaintiffs did not violate the First Amendment). To otherwise "suggest that rude and inconsiderate treatment of complainants ... is prohibited by the First Amendment is to trivialize the significance of the right to petition the government, making of the Constitution a font of tort law, and converting federal courts into small-claims tribunals." *Id.* (quotation marks omitted omitted). *Cf. Schroeder v. Dept. of Veterans Affairs,* No. 08–cv–351 (MRK), 2009 WL 1531953, at \*1–2 (D. Conn. June 1, 2009) (finding that plaintiff's allegation that defendant personnel had "hung up on him when he called to check on his claim" was insufficient to state a claim for any constitutional violation). Accordingly, Plaintiff's claim is dismissed to the extent that it is based upon Detective Vergona's rude comment.

### 2. Threat to Arrest

The Court turns to consider Plaintiff's claim that Detective Vergona retaliated against her for her exercise of First Amendment rights-in particular, her complaint against Ms. Hooks, her past "political activity, ... and [her] attempts to expose Defendant Vergona's unlawful threats of false arrest," Pl. Opp. 18–19 [2] -by threatening to arrest her. In order to state a claim for retaliation in violation of the First Amendment, a plaintiff must allege: "(1) [she] has an interest protected by the First Amendment; (2) defendants' actions were motivated or substantially caused by [her] exercise of that right; and (3) defendants' actions effectively chilled the exercise of [her] First Amendment Right." *Curley v. Vill. of Suffern,* 268 F.3d 65, 73 (2d Cir.2001). With respect to the third prong of this standard, a plaintiff who, like Ms. Troy, proceeds in her capacity as a private citizen (as opposed to a public employee or prisoner) must show that her speech has actually been chilled as a result of the retaliatory conduct, or that she has suffered some other concrete harm sufficient to confer standing. *See Zherka v. Amicone,* 634 F.3d 642, 645–46 (2d Cir.2011) ("Hurt feelings or a bruised ego are not by themselves the stuff of constitutional tort."). It is undisputed Plaintiff engaged in conduct protected by the Petition Clause by filing a complaint against Ms. Hooks, *see Estate of Morris ex rel. Morris v. Dapolito,* 297 F.Supp.2d 680, 692 (S.D.N.Y.2004) ("[I]t is axiomatic that filing a criminal complaint with law enforcement officials constitutes an exercise of the First Amendment right" to petition government for the redress of grievances.")

(quotation marks omitted), lodging complaints regarding the allegedly deficient investigation of that complaint, and engaging in political activism, *see* Com pl. 4–11. The Court therefore focuses its attention upon the second and third prongs of the test.

**\*8** The Court finds that Plaintiff has failed to adequately plead that Detective Vergona's threat to arrest her was motivated or substantially caused by the exercise of her First Amendment rights. Plaintiff alleges that, "[o]n or about Tuesday October 16, 2012, defendant VERGONA informed [Plaintiff] that he had just learned that Delita Hooks had filed a cross complaint against [her]," and that Detective Vergona immediately thereafter informed "[Plaintiff] that she must either drop her charges against Ms. Hooks, or he would arrest her." Compl. 36–37. These allegations cannot plausibly be understood to support the inference that Detective Vergona threatened to arrest Plaintiff in retaliation for her exercise of her right to petition-which Plaintiff had exercised over two weeks before, on October 1. *See* Compl. 15. Nor can they plausibly-or even conceivably-support the inference that Detective Vergona threatened to arrest Plaintiff in retaliation for her "attempts to expose Detective Vergona's unlawful threats of false arrest," *see* Pl. Opp. 18–19, as the allegedly retaliatory threat preceded Plaintiff's efforts to expose it. The Court further finds that Plaintiff has failed to plead any facts connecting Detective Vergona's threat to her past activism. Rather, the only plausible inference raised by Plaintiff's allegations is that Detective Vergona's threat was motivated by Ms. Hooks' cross complaint, of which he had just learned. *Cf. Curley,* 268 F.3d at 69–70, 73 (finding that arrest based upon complaint by putative victim was not motivated or substantially caused by plaintiff's exercise of First Amendment rights).

Also fatal to Plaintiff's claim is her failure to plead that her speech was "actually chilled" by the threat. As Plaintiff's Complaint makes clear, Plaintiff continued to exercise her First Amendment rights to complain of both the altercation with Ms. Hooks and the NYPD's failure to investigate that altercation after the threat-including by filing a complaint with IAB, *see* Compl. 43, 41, and contacting the Hate Crimes Unit, *see* Compl. 32–33. Nor has Plaintiff alleged that she suffered any other concrete, constitutionally cognizable harm, such as the revocation of a building permit. *See Dougherty v. Town of N. Hempstead Bd. of Zoning Appeals,* 282

F.3d 83, 91 (2d Cir.2002). The absence of any such allegation further precludes Plaintiff from stating a claim for retaliation in violation of the First Amendment. *See Zherka,* 634 F.3d at 645–46 (affirming dismissal of First Amendment retaliation claim where plaintiff had failed to allege actual chilling or "other form[ ] of tangible harm"). Because Plaintiff has thus failed to plead facts sufficient to satisfy the second and third prongs of the standard for unconstitutional retaliation in violation of the First Amendment, these claims are dismissed.

## C. Threat to Lodge False Charges and Fabrication of Evidence

Plaintiff next alleges that Defendants violated her due process rights to "freedom from the threat of lodging false charges ... by police officers" and "freedom from fabrication of evidence against her under the Fifth and Fourteenth Amendments." Compl. 53. The Court construes the Complaint to allege that Plaintiff was unconstitutionally deprived of liberty on the basis of Ms. Hooks' allegedly false cross complaint.

**\*9** "It is firmly established that a constitutional right exists not to be deprived of liberty on the basis of false evidence fabricated by a *government officer.*" *Zahrey v. Coffey,* 221 F.3d 342, 355 (2d Cir.2000) (emphasis added). However, Plaintiff has failed to plead facts plausibly stating such a claim: she alleges that the "false cross complaint" was filed by Ms. Hooks, Compl. 10, who is a receptionist for a doctor in private practice, and not a government officer. *Cf. Chodkowski v. City of New York,* No. 06–cv–7120 (LBS), 2007 WL 2717872, at \*9 (S.D.N.Y. Sept. 11, 2007) ("[P]roviding false information to the police does not make a private individual a state actor and liable under § 1983."). Nor has Plaintiff alleged that government officers caused, pressured, or otherwise participated in the filing of the false cross complaint. *Cf. Blake v. Race,* 487 F.Supp.2d 187, 216–17 (E.D.N.Y.2007) (denying summary judgment where there was "an issue of fact as to whether the defendant [officers] participated in the alleged fabrication of evidence" by coaching informant to give false testimony). This failure to plead that the false cross complaint was created by a government actor requires that Plaintiff's claim be dismissed.

But even if Plaintiff had adequately pleaded that the false cross complaint was fabricated by a government officer, her claim would fail because she has failed to plead that she was deprived of liberty as a result of the fabricated

evidence. As the Second Circuit emphasized in *Zahrey*, "[t]he manufacture of false evidence, 'in and of itself,' ... does not impair anyone's liberty, and therefore does not impair anyone's constitutional right ." 221 F.3d at 348. Plaintiff does not plead that she was deprived of her liberty as a result of Ms. Hooks' false cross complaint-to the contrary, her Complaint plainly alleges that she was *not* arrested. *See* Compl. 38. Nor has Plaintiff otherwise alleged that she was deprived of any protected interest. *Cf.* Rolon v. Henneman, 517 F.3d 140, 148–49 (2d Cir.2008) (affirming dismissal of claim where plaintiff had alleged that he had been deprived of overtime pay as a result of evidence fabricated by government officers, where the plaintiff failed to allege that "he had a legitimate claim to overtime" sufficient to establish a protected property interest). Thus, even accepting Plaintiff's allegations as true and drawing reasonable inferences in her favor, she has failed to state a claim for unconstitutional fabrication of evidence, and her claim is accordingly dismissed.

**D. Equal Protection**
Plaintiff further alleges that Defendants have violated her right to equal protection of the laws. Compl. 53. The Court construes Plaintiff's Complaint to allege that Plaintiff was subjected to unequal treatment because of her gender and religion, and that, in particular, Detective Vergona refused to investigate Plaintiff's complaint and threatened to arrest Plaintiff because she is a woman and because she is Jewish. *See* Compl. 21 (stating that "defendant VERGONA ... develop[ed] a misogynistic attitude toward [Plaintiff] ); Compl. 38 (alleging that Detective Vergona "[e]xercise[ed] his religious discrimination" by "refus [ing] to execute [Plaintiff's] arrest on any day other than Saturday"). This claim too must be dismissed.

**\*10** The Equal Protection Clause "is essentially a direction that all persons similarly situated should be treated alike," City of Cleburne v. Cleburne Living Ctr., 473 U.S. 432, 439 (1985), and it is violated when the government selectively denies government services to disfavored minorities, *see* Deshaney v. Winnebago Cnty. Dept. of Soc. Servs., 489 U.S. 189, 197 n. 3 (1989). In order to establish a denial of equal protection on the basis of selective treatment, a plaintiff must allege: (1) "compared with others similarly situated, [she was] selectively treated," and (2) "the selective treatment was motivated by an intention to discriminate on the basis of impermissible considerations," such as gender or religion.

Mosdos Chofetz Chaim, Inc. v. Vill. of Wesley Hills, 815 F.Supp.2d 679, 692 (S.D.N.Y.2011) (quoting Zahra v. Town of Southold, 48 F.3d 674, 683 (2d Cir.1995)). "To establish such intentional or purposeful discrimination, it is axiomatic that a plaintiff must allege that similarly situated persons have been treated differently." Gagliardi v. Vill. of Pawling, 18 F.3d 188, 193 (2d Cir.1994) (citing Cleburne, 473 U.S. at 439).

Any equal protection claim brought on the basis of Detective Vergona's threat to arrest Plaintiff is foreclosed by Plaintiff's failure to allege that she was treated differently than another who was similarly situated. To the contrary, Plaintiff alleges that "Det. Vergona did state he would arrest both [Plaintiff and Ms. Hooks]." Compl. 37. As previously discussed, " '[a] showing that the plaintiff was treated *differently* compared to others similarly situated' is a 'prerequisite' and a 'threshold matter' to a selective treatment claim." Mosdos Chofetz Chaim, 815 F.Supp.2d at 692 (quoting Church of the Am. Knights of the Ku Klux Klan v. Kerik, 356 F.3d 197, 210 (2d Cir.2004)) (emphasis added). Plaintiff's allegation that she was treated just like Ms. Hooks when threatened with arrest by Detective Vergona therefore precludes her from stating a claim for violation of equal protection on that basis.

Plaintiff does, however, allege that she was subjected to selective treatment with respect to the investigation of her complaint. [3] For example, Plaintiff alleges that "[Ms.] Hooks had a meeting promptly with the NYPD yet to date [Plaintiff] has yet to be interviewed in person by anyone from [NYPD] ... regarding" their altercation, Compl. 46, and speculates that Dr. Fagelman was interviewed during investigation of Ms. Hooks' cross-complaint, *see* Compl. 27. But even assuming that she was treated differently than Ms. Hooks with respect to the investigation of her complaint, Plaintiff has not adequately pleaded that this differential treatment was based upon her gender or religion.

As an initial matter, any claim that Plaintiff was treated differently on the basis of her gender must fail as she and Ms. Hooks are both women. This conclusion is not altered by consideration of the allegation that Plaintiff told Detective Vergona a joke about "afford[ing] injections ... to attract younger men," which Plaintiff believes caused Detective Vergona to "develop [ ] a misogynistic attitude towards [her]." Compl. 21. While mindful of its obligation

to construe Plaintiff's complaint liberally to raise the strongest arguments it suggests, *see DiPetto v. U.S. Postal Serv.,* 383 F. App'x 102, 103 (2d Cir.2010), the Court must nevertheless conclude that Plaintiff's speculation regarding the effect of her own gender related joke on another is insufficient to "nudge[ ]" her claim of gender-based discrimination "across the line from conceivable to plausible," *Iqbal,* 556 U.S. at 683.

 **\*11**  Nor has Plaintiff plausibly alleged that the differences between the NYPD's treatment of Ms. Hooks and herself are attributable to Plaintiff's religion. For one thing, Plaintiff has not pleaded that Ms. Hooks belongs to a different religion than Plaintiff. Moreover, Plaintiff pleads that she informed Detective Vergona that she was Jewish *after* the alleged unequal treatment-*i.e.* the deficient investigation-had already occurred. Specifically, Plaintiff alleges that, October 16, 2012, shortly after she was threatened with arrest and more than a week after Detective Vergona had refused to meet her in person, Plaintiff contacted Detective Vergona to reschedule her arrest for later that afternoon due to a conflicting dental appointment. Compl. 37, 21. It was during this later conversation that Plaintiff informed Detective Vergona that she was Jewish. *See* Compl. 38. In other words, the allegedly discriminatory conduct occurred *before* Detective Vergona learned of Plaintiff's religion. Intent to discriminate on the basis of religion cannot plausibly be inferred from such allegations, and Plaintiff's equal protection claim must therefore be dismissed.

### E. Failure to Intervene
The Court turns to Plaintiff's claim that certain defendants "witnessed the defendants unlawfully refuse to conform their conduct to the legal standard and threaten [her] with unlawful arrest in deprivation of her First Amendment, Fourteenth Amendment rights and other federal, state and common law rights." Compl. 53–54. The Court construes Plaintiff to allege that the individual defendants other than Detective Vergona failed to intervene in order to prevent the alleged injuries to her First and Fourteenth Amendment rights. As set forth above, this claim essentially consists of an allegation that these other defendants failed to investigate her complaints-conduct which is not barred by the Constitution. *See supra* § III.A.

Even if the Court did not construe this claim as one for failure to investigate, the claim would fail because Plaintiff has not adequately pleaded that her constitutional rights

were violated. For while "[i]t is widely recognized that all law enforcement officials have an affirmative duty to intervene to protect the constitutional rights of citizens from infringement by other law enforcement officers in their presence," *Anderson v. Branen,* 17 F.3d 552, 557 (2d Cir.1994), in the absence of a constitutional violation, there can be no violation of the duty to intervene, *see Curley,* 268 F.3d at 72 (finding that "where ... the arresting officers committed no infringement," there could be no liability based on the violation of the duty to intervene). Because Plaintiff has not sufficiently alleged that her constitutional rights were violated, her claim for violation of the duty to intervene must also be dismissed.

### F. *Monell* Liability
Plaintiff's failure to adequately plead that her constitutional rights were violated also precludes her from stating a claim for municipal liability against the City. For when "a person has suffered no constitutional injury at the hands of the individual police officer, the fact that the departmental regulations might have *authorized* the [constitutional violation] is quite beside the point." *City of Los Angeles v. Heller,* 475 U.S. 796, 799 (1986) (emphasis in original); *see, e.g., Mitchell v. City of New York,* No. 12–cv–2674 (LAK), 2014 WL 535046, at \*6 (S.D.N.Y. Feb. 11, 2014) ("Having held that plaintiffs have failed to adduce facts supporting a constitutional claim, plaintiffs' claim of municipal liability must fail under the rule announced in *Monell.*"). Accordingly, Plaintiff's claims against the City are dismissed as well.

 **\*12**  But even if Plaintiff had adequately pleaded that her constitutional rights were violated, her claim for municipal liability would fail. While no heightened pleading standard applies to claims for municipal liability under § 1983, a plaintiff alleging municipal liability must nevertheless plead facts sufficient to render plausible the claim that her injuries were caused by a municipal custom or policy. *See Plair v. City of New York,* 789 F.Supp.2d 459, 468–69 (S.D.N.Y.2011). The threadbare allegations in the Complaint fail to meet this standard. For example, Plaintiff's conclusory assertion that it was the "custom[ ], practice[ ], procedure[ ] and rule[ ]" of the City to engage in the "abuse of authority to deprive citizens of their right to lodge complaints about a city agency, namely the NYPD," Compl. 55, is not accompanied by any facts giving rise to a plausible inference that such a policy or practice actually existed. There is, for instance, "no allegation that any official policymaker or policymaking body took any

action to establish" such a policy, nor any other factual allegation tending to show that such a policy was in place. *Missel v. Cnty. of Monroe,* 351 F. App'x 543, 545–46 (2d Cir.2009) (citing *Dwares v. City of New York,* 985 F.2d 94, 100–02 (2d Cir.1993)). This failure to adequately plead that her injuries were caused by a municipal custom or policy provides an additional reason to dismiss Plaintiff's *Monell* claim against the City. *see id.*

## G. State Law Claims

The Court having determined that Plaintiff has failed a claim to relief under federal law, only her state-law claims remain. Whether to exercise supplemental jurisdiction over these claims is a decision resting "within the sound discretion of the district court ." *Lundy v. Catholic Health Sys. of Long Island Inc.,* 711 F.3d 106, 117 (2d Cir.2013) (citing *Carnegie–Mellon Univ. v. Cohill,* 484 U.S. 343, 349–50 (1988)). Ordinarily, when "all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine-judicial economy, fairness, and comity-will point toward declining to exercise jurisdiction over the remaining state-law claims." *Carnegie–Mellon Univ.,* 484 U.S. at 350 n. 7;

*see, e.g., Healy v. City of New York Dep't of Sanitation,* 286 F. App'x 744, 746–47 (2d Cir.2008) (concluding that where plaintiff's federal claims were "dismissed at an early stage of the litigation," district court should have "declin[ed] to exercise supplemental jurisdiction"). The Court concludes those factors do indeed weigh against the exercise of supplemental jurisdiction in this case, and Plaintiff's state-law claims are accordingly dismissed without prejudice so that she may pursue them in state court if she wishes.

## IV. Conclusion

For the foregoing reasons, Defendant's motion to dismiss is granted, and Plaintiff's Complaint is dismissed for failure to state a claim, except that her state-law claims are dismissed without prejudice. The Clerk of Court is requested to terminate the case.

**\*13** SO ORDERED.

## All Citations

Not Reported in F.Supp.3d, 2014 WL 4804479

## Footnotes

1   As Plaintiff's Complaint contains neither page nor paragraph numbers, the Court refers to the ECF page numbers printed on the top of the document.

2   In this section, Plaintiff also argues that she was subjected to selective treatment "for ... being a Jewish woman." Pl. Opp. 18. The Court construes these claims as sounding in Equal Protection, and they are addressed separately below. *See infra* § III.D.

3   While the Constitution provides individuals with no affirmative right to an investigation of their claims by the government, it does prohibit the government from treating individuals unequally when determining which claims to investigate. *See Myers v. Cnty. of Orange,* 157 F.3d 66 (2d Cir.1998) (finding that municipal policy of investigating only first-filed complaints and prohibiting cross-complaints violated the Equal Protection Clause).

End of Document                              © 2016 Thomson Reuters. No claim to original U.S. Government Works.